LAND, J.
Plaintiff sued to recover $7,-203.57 damages alleged to have been occasioned by the negligent obstruction of the navigation of the Atchafalaya river at Morgan City by defendant during the latter part of the year 1902.
The petition alleged that defendant had constructed, without authority from the Congress of the United States, a large railroad bridge on wooden piers across Berwick Bay at Morgan City, with a draw or turntable for the passage of boats, and that the same had been used by said company for a number of years; that in the latter part of the year 1902 the defendant, through its servants, agents, and employés, negligently, carelessly, and recklessly broke the draw span of the bridge, dumped several cars into the river, unlawfully obstructed the navigation at said point by driving piling where said bridge was broken, unnecessarily delayed the removal of said piling, and unnecessarily obstructed the navigation through said bridge for a period-of three months.
The petition further alleged that plaintiff was a iarge sugar planter, having a large refinery at Glenwild, above Morgan City, on said river, at which he manufactured cane into sugar and molasses; that plaintiff had several sugar plantations on said river below Morgan City; and that the cane grown on said plantation, as well as that purchased by him from other planters of the vicinage, was transported in barges towed by steamboats to his said refinery at Glenwild. The petition further alleged that during the said obstruction of navigation it became necessa- . ry for plaintiff to take off his sugar crop; /that he notified the defendant of the nature [ of his business, and the necessity of moving his cane by water to the refinery, and demanded that navigation be' opened for that purpose, but that defendant company refused to do so.
Plaintiff alleged that the obstruction of navigation compelled him to keep two steamboats, instead of one, and .that he suffered damage and injury in the sum of $1,695.75, cost of keeping an extra steamboat above the bridge; $261.20 for extra expense for eight days of steamboat; $3,040, delay in running refinery; and $2,206.20, delay of plantation work.
Defendant, after excepting to the petition, answered, pleading the general issue, and averring that, if any damage was suffered)' by plaintiff, the same proceeded directly and/ proximately from defendant’s legal and duly) authorized work of repairing the broken) bridge, and constituted damnum absque in-j juria, and that defendant exerted the utmost diligence and expedition in making the necessary repairs to the bridge in the interests of navigation. ,
The case was tried before the district judge, who rendered judgment in favor of defendant. Plaintiff appealed.
We are indebted- to our learned Brother of the district court for his carefully prepared written opinion, which has aided us materially in the investigation of this case.
Defendant company was incorporated by special act of the Legislature in 1877, and was specially authorized to cross Berwick’s Bay by bridge or ferry, and empowered generally to cross any river, lake, or water course within the state, subject to the obligation of constructing draws on streams navigable by enrolled and licensed vessels, and when required by law. Section 2, Act 37, p. 37, of Acts 1S77.
The railroad bridge in question was constructed in the year 1882, with a draw sufficient in dimension for the purposes of navigation.
On October 5, 1902, a freight train of the defendant company ran into'and on this draw span while partly open, and broke and destroyed ij:s western arm, which fell with five freight cars into the river. The eastern arm of the span remained intact and stationary, barring the passage of steamboats.
*84 The defendant company applied to the War Department for a permit to build a trestle from the center pier of the bridge to the west shore, in order to temporarily move traffic, and to close navigation for ten days or two weeks, pending repairs. The Secretary of War replied that he had no power to authorize the closing of the river to navigation, but that the department would not interfere if the navigation was not impeded for more than ten days; it being understood that the company would be liable for all injuries inflicted on private interests by reason of the interruption of navigation.
The defendant company thereupon drove pilings and erected the temporary structure, which closed the navigation of the river a few days after the bridge was broken.
The defendant company took steps to have the broken draw span repaired, but the work was not completed and the river opened to navigation until January 26, 1903, after having been closed by defendant’s obstructions for at least 3y2 months.
Plaintiff owned and operated a large sugar factory situated on the river, a few miles above the railroad bridge, and, in the usual course of his business, transported cane, raised and purchased by him below the bridge, in barges towed by a steamboat to his refinery. The tows necessarily passed through the open draw. Three weeks after the bridge was broken, plaintiff was ready to commence operations. His barges could pass under the framework of the bridge, but his steamboat could not. He was compelled to employ an extra steamboat to tow the barges to or from the bridge.
We concur in the opinion of the district judge that defendant company had the legal authority to erect and maintain said bridge across Berwick’s Bay. In Hamilton v. Railroad Company, 34 La. Ann. 970, 44 Am. Rep. 451, decided in 1882, this court held that “the state Legislatures have unlimited power to erect bridges and railways and make any other works across navigable waters, subject only to the paramount authority of the national government”; citing a number of decisions of the Supreme Court of the United States, and other authorities. In that ease legislative authority to bridge navigable streams was implied from the power granted a railway company to build a road between two points in the state.
The district judge said:
“It is not disputed that the drawbridge was broken by the reckless and negligent act of the employe of the defendant.”
He, however, held that, as such negligent breaking did not obstruct navigation, it cannot be considered as the direct and proximate cause of injury to plaintiff, which was occasioned immediately by the erection of the trestlework which was necessary for the lawful purpose of-repairing the bridge. In other words, the district judge considered that the breaking of the bridge was the remote cause of the injury, though such negligent act rendered it necessary for the company, and in its own interest, to obstruct navigation in order to repair the damages to the structure. The district judge further held that the repairs were not unreasonably delayed, and that the temporary obstruction to navigation was not unreasonably continued.
It is admitted that the breaking of the bridge closed the usual navigable channel beneath the eastern arm of the draw. The western channel was seldom used by boats, on account of the nearness of the shore, which rendered entrance and exit difficult. This channel was also obstructed by the wreckage of the bridge. One witness testified that there was a depth of 35 feet of water in this western channel, and several stated that after the removal of the débris one or more small boats passed through. It may be that this western channel might have been used for the purpose of navigation if it had been, left open. But it was obstructed within three days by the works constructed by the defend-, *85 ant company for railroad purposes, and was kept closed to navigation for more than three months.
a We start out, in the consideration of this (/case, with the undisputed fact that the Í breaking of the bridge was occasioned by the reckless negligence of defendant company, and that the direct result of that negligence was the obstruction of the navigation of the river. It was the duty of the defend•«ant'to remove these obstructions to navigation, but instead of doing so the company placed additional obstructions in the western 'channel, while the eastern channel remained (closed by the stationary arm of the draw. The defendant company acted solely in its own interest and disregarded the interest of the public. The company was informed by the distinguished jurist then Secretary of War that there was no power lodged in his . department to authorize the closing of the / river to navigation while repairs were being I made, but that, if the temporary interruption did not exceed 10 days, the department would not interfere; “it being understood that the company will be liable for any injuries' inflicted upon private interests by reason of such interruption.”
The company proceeded under this tacit permit, and subject to the condition of liability above expressed. After the lapse of 10 days the company had no authority, express or tacit, to continue the interruption of navigation.
The contention of the defendant is that the' repair work, which was lawful, was the direct and proximate cause of the alleged injury, while the negligent breaking of the bridge was the remote cause.
This argument has no application to the eastern channel of the river, which was ordinárily used for the purposes of navigation, ánil Vhich remained closed. As to the westérn‘‘channel, the wreck closed it to navigation, and, if it was opened by the removal of'the wreckage, it was almost immediately closed by the works of the defendant constructed for the temporary use of its trains. Bridges over the largest rivers are constructed without interrupting navigation, and doubtless in the instant case the broken span could have been replaced without closing navigation for any material length of time. But the traffic of the road would have been interrupted, and the company compelled to transfer freight and passengers by boat across the river. We cannot concur in the proposition that a railroad company has the legal right to close a river to navigation for three months or more, for the purpose of repairing a bridge broken by its own negligence, or of facilitating its own business. The right of the public in a navigable stream is at least equal to the right of a railroad to cross the same, and this right to cross is subject to the condition that its bridge be so constructed and maintained as not to unnecessarily interrupt navigation. The case of Hamilton v. Railroad Company, 34 La. Ann. 940, 44 Am. Rep. 451, rests on a peculiar state of facts, which absolved the company from all blame. The draw had become rotten and unsafe. The stream was navigable only for a few months of the year. The company erected its temporary bridge at a time when the stream was not navigable, and had every reason to believe that its new bridge would be completed before the opening of navigation. But the work was unavoidably delayed by unexpected, unforeseen, and unpreeedent rains, which at the same time produced an unusually early stage of navigable water in the river. The court, after reviewing the facts of the case, said:
“The delay was caused by accidents and circumstances over which the company had no possible control, and for which it cannot be held responsible in justice or in law.”
In such cases, where the inconvenience to private parties is temporary and unavoidable, it is damnum absque injuria. Same case, 119 U. S. 280, 7 Sup. Ct. 206, 30 L. Ed. 393.
We do not think that the doctrine can be extended to a case where the necessity for *86 ■'repairing a bridge was created by the neg- ■ ligence of a railroad company.
Tbe case of Briggs and Others y. Railroad Company, 30 Hun (N. Y.) 219 (June term, 1883), is in point. There, while the draw was open, and a canal boat was passing through, the defendant carelessly and negligently ran a locomotive into the draw and upon the boat, sinking it, and thereby suspending all navigation at that place for a period of five days. Immediately after the accident the defendant proceeded with due diligence to remove the obstruction and repair the bridge. The owners of several canal boats were compelled to wait at the bridge until the obstruction was removed. Held, that they were entitled to recover. ■
In the case at bar the defendant, having negligently obstructed the navigation of the river, claims immunity from the consequences on the ground that the obstructions were partially removed from one of the channels, and it thereby was opened to navigation. When charged with closing the same channel, defendant replied that it had the legal right to do so for the purpose of making repairs to the bridge, and that the alleged injury resulted from the lawful work of repairing, and not from the original negligence , in obstructing the channel.
The original negligence produced a certain injurious result; i. e., the closing of navigation. Defendant’s work of reparation intensified that result by rendering it impracticable to open the river to navigation. Conceding that the injury was the direct and immediate result of the repairs, they in turn were the natural consequence of the original negligence.
The general rule is laid down by Thompson on Negligence, vol. 2, p. 1084, as follows:
“Whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary and natural course of events, though such consequences be immediately and directly brought about by intervening causes, if such intervening .causes were set in motion by the original wrongdoer.”
The intervention of other causes not wrongful makes no difference. Cooley on Torts (2d Ed.) p. 76.
The negligent breaking of the bridge was the primary, paramount cause, which led to the obstruction of navigation as well as the work of reparation; and if, as argued, such work was the immediate cause of the injury, it was simply an intervening cause set in motion by the party originally in fault. It may be said that the remedy was worse than the disease.
We therefore are of opinion that defendant is responsible in damages caused by the obstruction of navigation. There is no difficulty as to the allowance of the first item for extra expense incurred in the transportation of cane to plaintiff’s refinery.
As to the other three items, they are based on alleged delays in the actual work of transportation, the extent and causes of which are not shown with any degree of' certainty. Plaintiff’s contention is that, owing to delays in the transportation of cane, occasioned by the transfer of barges at the bridge, and other causes, he was compelled to run his refinery and his steamboat eight days longer than usual, and that, on account of the irregularity in which empty barges were delivered at the landings, much valuable time was lost on the plantations.
No records were kept, showing the delays in transportation or the time lost on the plantations; but the result is arrived at by showing that the refinery ran eight days longer than usual, and that the expense for labor o'n the plantation was greater than in the preceding or following year. All this extra expense is charged to delays in transportation, and all the delays charged to the broken bridge.
We have read all the evidence in the record, and no useful purpose would be sub-served by transcribing even its substance into this opinion. We find that the witnesses differ as to the causes and extent of the delays; that the deliveries of cane barged *87 through the bridge varied from day to day, running from 104 to 706 tons; that the means and mode of transportation were the same all the time; and that there is no sufficient evidence to justify the conclusion that with good management the cane could not have been delivered eight days earlier.
To show the uncertainty of such demands, it appears that plaintiff entered into an agreement with one Mr. Zenor, by which each furnished a steamboat, one to work above and the other below the bridge. It was agreed, however, that Mr. Zenor’s work should have the preference. Mr. Zenor’s work was not delayed at all. Plaintiff claims that his work was very much detailed. This may have been the result of his agreement with Mr. Zenor. Plaintiff was an experienced, practical planter, of targe means, and abundantly able to buy or charter a steamboat, and jmt he was satisfied with the arrangement as above described.
The damages claimed for delays are too uncertain and remote to be recovered.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be reversed, and it is now ordered and decreed that the plaintiff do have and recover of the defendant company the sum of $1,695.75, with legal interest from this date, and costs in both courts.