752 F.2d 1019
 22 ERC 1491, 88 A.L.R.Fed. 239, 1985
A.M.C. 1521, 53 USLW 2412,
15 Envtl. L. Rep. 20,273
 STATE OF LOUISIANA, ex rel. William J. GUSTE, Jr., Attorney
General, et al., Plaintiffs,
Ventura Trading Company, Ltd., Inc., et al., Plaintiffs-Appellants,
v.
M/V TESTBANK, her engines, tackle, apparel, her owners,
etc., et al., Partenreederei M/S Charlotta, etc.,
et al., Defendants-Appellees.
 No. 82-3059.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 11, 1985.
 
 Gelpi, Sullivan, Carroll & LaBorde, Gerard T. Gelpi, Randall C. Coleman, III, New Orleans, La., Sidney D. Torres, III, Kenneth B. Krobert, Chalmette, La., for Ventura et al.
 Phelps, Dunbar, Marks, Claverie & Sims, James B. Kemp, Jr., New Orleans, La., for Farrell Lines, Inc.
 Leger & Mestayer, Walter J. Leger, Jr., Courtenay, Forstall, Grace & Hebert, Thomas J. Grace, Theodore W. Brin, New Orleans, La., for plaintiffs.
 Christovich & Kearney, James F. Holmes, New Orleans, La., for Container Lift.
 Patrick L. Burke, J. Dwight LeBlanc, Jr., Kenneth J. Servay, New Orleans, La., for Partenreederei.
 
 
 1
 Walter Carroll, Jr., Jean Melancon, New Orleans, La., for Fortune Sea & London S.S.
 
 
 2
 Robert B. Deane, New Orleans, La., for Partenreederei and United Kingdom.
 
 
 3
 Benjamin W. Yancey, New Orleans, La., for Fortune Sea Transp.
 
 
 4
 Appeals from the United States District Court for the Eastern District of Louisiana.
 
 
 5
 Before CLARK, Chief Judge, WISDOM, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS and HILL, Circuit Judges.
 
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 6
 We are asked to abandon physical damage to a proprietary interest as a prerequisite to recovery for economic loss in cases of unintentional maritime tort. We decline the invitation.[1]
 
 
 7
 * In the early evening of July 22, 1980, the M/V SEA DANIEL, an inbound bulk carrier, and the M/V TESTBANK, an outbound container ship, collided at approximately mile forty-one of the Mississippi River Gulf outlet. At impact, a white haze enveloped the ships until carried away by prevailing winds, and containers aboard TESTBANK were damaged and lost overboard. The white haze proved to be hydrobromic acid and the contents of the containers which went overboard proved to be approximately twelve tons of pentachlorophenol, PCP, assertedly the largest such spill in United States history. The United States Coast Guard closed the outlet to navigation until August 10, 1980 and all fishing, shrimping, and related activity was temporarily suspended in the outlet and four hundred square miles of surrounding marsh and waterways.
 
 
 8
 Forty-one lawsuits were filed and consolidated before the same judge in the Eastern District of Louisiana. These suits presented claims of shipping interests, marina and boat rental operators, wholesale and retail seafood enterprises not actually engaged in fishing, seafood restaurants, tackle and bait shops, and recreational fishermen. They proffered an assortment of liability theories, including maritime tort, private actions pursuant to various sections of the Rivers & Harbors Appropriation Act of 1899 and rights of action under Louisiana law. Jurisdiction rested on the proposition that the collision and contamination were maritime torts and within the court's maritime jurisdiction. See 28 U.S.C. Sec. 1333.
 
 
 9
 Defendants moved for summary judgment as to all claims for economic loss unaccompanied by physical damage to property. The district court granted the requested summary judgment as to all such claims except those asserted by commercial oystermen, shrimpers, crabbers and fishermen who had been making a commercial use of the embargoed waters. The district court found these commercial fishing interests deserving of a special protection akin to that enjoyed by seamen. See State of Louisiana ex rel. Guste v. M/V Testbank, 524 F.Supp. 1170, 1173-74 (E.D.La.1981).[2]
 
 
 10
 On appeal a panel of this court affirmed, concluding that claims for economic loss unaccompanied by physical damage to a proprietary interest were not recoverable in maritime tort. 728 F.2d 748 (5th Cir.1984). The panel, as did the district court, pointed to the doctrine of Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), and its development in this circuit. Judge Wisdom specially concurred, agreeing that the denial of these claims was required by precedent, but urging reexamination en banc. We then took the case en banc for that purpose. After extensive additional briefs and oral argument, we are unpersuaded that we ought to drop physical damage to a proprietary interest as a prerequisite to recovery for economic loss. To the contrary, our reexamination of the history and central purpose of this pragmatic restriction on the doctrine of foreseeability heightens our commitment to it. Ultimately we conclude that without this limitation foreseeability loses much of its ability to function as a rule of law.
 
 II
 
 11
 Plaintiffs[3] first argue that the "rule" of Robins Dry Dock is that "a tort to the property of one which results in the negligent interference with contractual relationships of another does not state a claim," and that so defined, Robins Dry Dock is here inapplicable. Next and relatedly, plaintiffs urge that physical damage is not a prerequisite to recovery of economic loss where the damages suffered were foreseeable. Third, plaintiffs argue that their claims are cognizable in maritime tort because the pollution from the collision constituted a public nuisance and violated the Rivers and Harbors Appropriation Act of 1899, as well as Louisiana law.
 
 
 12
 Defendants urge the opposite: that Robins Dry Dock controls these cases; that the physical damage limitation on foreseeability ought to be retained; and that plaintiffs stated no claim for "federal pollution," either as a nuisance or under the Rivers and Harbors Act. Finally, defendants reply that state law is not applicable to this maritime collision case and in any event provides plaintiffs no claim.
 
 III
 
 13
 The meaning of Robins Dry Dock v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) (Holmes, J.) is the flag all litigants here seek to capture. We turn first to that case and to its historical setting.
 
 
 14
 Robins broke no new ground but instead applied a principle, then settled both in the United States and England, which refused recovery for negligent interference with "contractual rights." Stated more broadly, the prevailing rule denied a plaintiff recovery for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest. See, e.g., Byrd v. English, 117 Ga. 191, 43 S.E. 419 (1903); Cattle v. Stockton Waterworks Co., 10 Q.B. 453, 457 (C.A.1875). See also James, Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal, 25 Vand.L.Rev. 43, 44-46 (1972) (discussing history of the rule); Carpenter,Interference with Contract Relations, 41 Harv.L.Rev. 728 (1928). Professor James explains this limitation on recovery of pure economic loss: "The explanation ... is a pragmatic one: the physical consequences of negligence usually have been limited, but the indirect economic repercussions of negligence may be far wider, indeed virtually open-ended." James, supra, at 45.
 
 
 15
 Decisions such as Stockton illustrate the application of this pragmatic limitation on the doctrine of foreseeability. The defendant negligently caused its pipes to leak, thereby increasing the plaintiff's cost in performing its contract to dig a tunnel. The British court, writing fifty-two years before Robins, denied the plaintiff's claim. The court explained that if recovery were not contained, then in cases such as Rylands v. Fletcher, 1 L.R.--Ex. 265 (1866), the defendant would be liable not only to the owner of the mine and its workers "but also to ... every workman and person employed in the mine, who in consequence of its stoppage made less wages than he would otherwise have done." Id. at 457. See also Societe Anonyme de Remorquage a Helice v. Bennets, [1911] 1 K.B. 243.
 
 
 16
 -1-
 
 
 17
 In Robins, the time charterer of a steamship sued for profits lost when the defendant dry dock negligently damaged the vessel's propeller. The propeller had to be replaced, thus extending by two weeks the time the vessel was laid up in dry dock, and it was for the loss of use of the vessel for that period that the charterer sued. The Supreme Court denied recovery to the charterer, noting:
 
 
 18
 ... no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong. (citation omitted). The law does not spread its protection so far.
 
 
 19
 275 U.S. at 309, 48 S.Ct. at 135. Justice Holmes did not stop with this delphic language, but with a citation to three cases added a further signal to his meaning:
 
 
 20
 A good statement, applicable here, will be found in Elliott Steam Tug Co., Ltd. v. The Shipping Controller, [1922] 1 K.B. 127, 139, 140; Byrd v. English, 117 Ga. 192, 43 S.E. 419; The Federal No. 2 (C.C.A. [1927] 21 F.2d 313.
 
 
 21
 Id.
 
 
 22
 The plaintiff in Elliott Steam Tug was a charterer of a tug boat who lost profits when the vessel was requisitioned by the admiralty under wartime legislative powers. In applying an indemnity statute that authorized recovery, the court noted that the charterer could not have recovered at common law: "[t]he charterer in collision cases does not recover profits, not because the loss of profits during repairs is not the direct consequence of the wrong, but because the common law rightly or wrongly does not recognize him as able to sue for such an injury to his mere contractual rights." Id. at 140. (emphasis supplied). In Byrd v. English, recovery of lost profits was denied when a utility's electrical conduits were negligently damaged by defendant, cutting off power to plaintiff's printing plant. In The Federal No. 2, the third case cited by Justice Holmes, the defendant tug negligently injured plaintiff's employee while he was working on a barge. The Second Circuit denied the employer recovery from the tug for sums paid to the employee in maintenance and cure. The court (Manton, Swan and Augustus Hand) explained:
 
 
 23
 It is too indirect to insist that this may be recovered, where there is neither the natural right nor legal relationship between the appellant and the tug, even though the alleged right of action be based upon negligence.
 
 
 24
 21 F.2d at 314.
 
 
 25
 -2-
 
 
 26
 The principle that there could be no recovery for economic loss absent physical injury to a proprietary interest was not only well established when Robins Dry Dock was decided, but was remarkably resilient as well. Its strength is demonstrated by the circumstance that Robins Dry Dock came ten years after Judge Cardozo's shattering of privity in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916). See also Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275 (1922). Indeed this limit on liability stood against a sea of change in the tort law. Retention of this conspicuous bright-line rule in the face of the reforms brought by the increased influence of the school of legal realism is strong testament both to the rule's utility and to the absence of a more "conceptually pure" substitute.[4] The push to delete the restrictions on recovery for economic loss lost its support and by the early 1940's had failed. See W. Prosser, Law of Torts Sec. 129, at 938-940 (4th ed. 1971). In sum, it is an old sword that plaintiffs have here picked up.
 
 
 27
 -3-
 
 
 28
 Plaintiffs would confine Robins to losses suffered for inability to perform contracts between a plaintiff and others, categorizing the tort as a species of interference with contract. When seen in the historical context described above, however, it is apparent that Robins Dry Dock represents more than a limit on recovery for interference with contractual rights. Apart from what it represented and certainly apart from what it became, its literal holding was not so restricted. If a time charterer's relationship to its negligently injured vessel is too remote, other claimants without even the connection of a contract are even more remote.
 
 
 29
 It is true that in Robins the lower courts had sustained recovery on contract principles, but the Supreme Court pushed the steamship company's contract arguments aside and directly addressed its effort to recover in tort. The Robins court, however, pushed the steamship company's contract arguments aside and directly addressed its effort to recover in tort. The language and the cases the Robins Court pointed to as "good statement[s]" of the principle make plain that the charterer failed to recover its delay claims from the dry dock because the Court believed them to be too remote. Notably, although the dry dock company did not know of the charter party when it damaged the propeller, delay losses by users of the vessel were certainly foreseeable. Thus Robins was a pragmatic limitation imposed by the Court upon the tort doctrine of foreseeability.
 
 
 30
 In a sense, every claim of economic injury rests in some measure on an interference with contract or prospective advantage. It was only in this sense that profits were lost in Byrd v. English when the electrical power to plaintiffs printing plant was cut off. The printing company's contractual right to receive power was interfered with, and in turn, its ability to print for its customers was impinged. That the printing company had a contract with the power company did not make more remote the relationship between its loss of profits and the tortious acts. To the contrary, the contract reduced this remoteness by defining an orbit of predictable injury smaller than if there were no contract between the power company and the printer. When the loss is economic rather than physical, that the loss caused a breach of contract or denied an expectancy is of no moment. If a plaintiff connected to the damaged chattels by contract cannot recover, others more remotely situated are foreclosed a fortiori. Indisputably, the Robins Dry Dock principle is not as easily contained as plaintiff would have it. We turn to our application of the principle, its application in other circuits, and the tort law of our Gulf states before returning to the doctrine itself.
 
 
 31
 -4-
 
 
 32
 This circuit has consistently refused to allow recovery for economic loss absent physical damage to a proprietary interest. In Kaiser Aluminium & Chemical Corp. v. Marshland Dredging Co., Inc., 455 F.2d 957 (5th Cir.1972), the plaintiff lost gas supplies when the defendant negligently broke a gas pipeline. We held that because the interference with Kaiser's business was only negligently inflicted, recovery was precluded as a matter of law. In Dick Meyers Towing Service, Inc. v. United States, 577 F.2d 1023 (5th Cir.1978), we denied recovery to a tug boat operator for damages suffered when a lock on Alabama's Warrior River was closed as a result of defendant's negligence. We explained:
 
 
 33
 The law has traditionally been reluctant to recognize claims based solely on harm to the interest in contractual relations or business expectancy. The critical factor is the character of the interest harmed and not the number of parties involved.
 
 
 34
 Id. at 1025.
 
 
 35
 We denied recovery to the Louisville & Nashville Railroad for its loss suffered when the M/V BAYOU LACOMBE damaged a bridge that the railroad had a contract right to use. Louisville & Nashville R.R. Co. v. M/V BAYOU LACOMBE, 597 F.2d 469 (5th Cir.1979). We rejected the railroad's argument that its right to use the damaged bridge was a property right sufficient to support recovery, concluding that whatever its label, recovery was sought for loss of an economic expectancy. Id. at 474.
 
 
 36
 In Vicksburg Towing Co. v. Mississippi Marine Transport Co., 609 F.2d 176 (5th Cir.1980) (Politz, J.), we sustained recovery by an owner of a dock leased to another for damages to the dock caused by defendant's negligence. We asserted that the distinction between recovery by an owner when his property was damaged and recovery by others, as applied in Robins, Dick Meyers, and M/V BAYOU LACOMBE, was "meaningful, real and dispositive." Id. at 177.[5]
 
 
 37
 -5-
 
 
 38
 Nor has this circuit been the sole guardian of the Robins Dry Dock principle. Rederi A/B Soya v. Evergreen Marine Corp., 1972 A.M.C. 1555, (E.D.Va.1971), aff'd, 1972 A.M.C. 538 (4th Cir.1972), was a case factually similar to Robins. There the Fourth Circuit adopted the opinion of the district court that had denied on the basis of Robins a time charterer's claim for profits lost when his leased vessel was negligently damaged. An identical result was reached in Federal Commerce & Navigation Co. v. M/V MARATHONIAN, 528 F.2d 907 (2d Cir.1975), cert. denied, 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976).
 
 
 39
 In Henderson v. Arundel Corp., 262 F.Supp. 152 (D.Md.1966), aff'd, 384 F.2d 998 (4th Cir.1967), the court applied Robins to deny claims by seamen for wages lost when the vessel on which they worked was negligently damaged in a collision. Courts in the First and Sixth Circuits have applied Robins in similar fashion. See, e.g., Hayes v. Luckenbach S.S. Co., 92 F.Supp. 684 (D.Mass.1950), and Casado v. Schooner Pilgrim, Inc., 171 F.Supp. 78 (D.Mass.1959) (seamen denied recovery of wages lost when vessel was negligently damaged); Complaint of Great Lakes Towing Co., 395 F.Supp. 810 (N.D.Ohio 1974) (dockworkers denied recovery of wages lost when dock was negligently damaged).[6]
 
 
 40
 The court in General Foods Corp. v. United States, 448 F.Supp. 111 (D.Md.1978), faced a situation similar to that presented to us in M/V BAYOU LACOMBE. A ship collided with a railroad bridge over the Chesapeake and Delaware Canal, forcing General Foods to ship by truck goods moving to and from one of its plants. Relying on Robins Dry Dock, the court denied General Foods recovery for these additional costs. The court discussed Robins, the decisions applying its rule, as well as decisions which assertedly undermined the doctrine and concluded:
 
 
 41
 Imposition of liability in the present case involves precisely the limitless type of liability which courts have consistently considered excessive for negligence. Neither the case law nor the sound policy considerations on which the decisions are bottomed support plaintiff's claims for its economic losses. Even assuming General Foods is a foreseeable plaintiff, "the law does not spread its protection so far."
 
 
 42
 Id. at 116.
 
 
 43
 Plaintiffs urge that the decisions in Petition of Kinsman Transit Co., 388 F.2d 821 (2d Cir.1968) (Kinsman II ), and Union Oil Co. v. Oppen, 501 F.2d 558 (9th Cir.1974), support their arguments that the Robins Dry Dock principle should be abandoned. We disagree. The policy considerations on which both those decisions are bottomed confirm our opinion that pragmatic limitations on the doctrine of foreseeability are both desirable and necessary.
 
 
 44
 In Kinsman "an unusual concatenation of events on the Buffalo River" resulted in a disaster which disrupted river traffic for several months.[7] Because of the disruption, the plaintiffs incurred extra expenses in fulfilling their contracts to supply and transport wheat and corn. In a previous panel decision arising out of the same facts, the court had rejected the defendants' arguments that recovery by such plaintiffs should be disallowed because their injuries were not foreseeable. Judge Friendly stated that while "[f]oreseeability of danger [was] necessary to render conduct negligent," it was not required that the defendants envision the precise harm resulting from their conduct before liability could be imposed. Petition of Kinsman Transit Co., 338 F.2d 708, 724 (2d Cir.1964) (Kinsman I ).
 
 
 45
 In Kinsman II the defendants argued that the plaintiffs' claims should be denied because there was no cause of action for negligent interference with a contractual right. The court dismissed the claims, but did so on the basis that the damages were too remote.[8] Thus, plaintiffs argue, Kinsman supports using foreseeability to determine whether their claims are cognizable in maritime tort. We think the opinion itself answers that contention. While rejecting any bright line rule, the court recognized that foreseeability was not a panacea and that limits on that concept should be maintained.
 
 
 46
 [I]t was a foreseeable consequence of the negligence ... that the river would be dammed.... It may be that the specific manner was not foreseeable in which the damages to Cargill and Cargo Carriers would be incurred but such strict foreseeability ... has not been required.
 
 
 47
 [Yet] ... "somewhere a point will be reached when courts will agree that the link has become too tenuous ..." (citation omitted). We believe that this point has been reached with the Cargill and Cargo Carrier claims....
 
 
 48
 In the final analysis, the circumlocution whether posed in terms of "foreseeability," "duty," "proximate cause," "remoteness," etc. seems unavoidable.... [W]e return to Judge Andrews' frequently quoted statement in Palsgraf ... "It is all a question of expediency ... of fair judgment, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."
 
 
 49
 Kinsman II, 388 F.2d at 824-25.
 
 
 50
 As we explain in Part IV of this opinion, we disagree with a case-by-case approach because we think the value of a rule is significant in these maritime decisions. Kinsman II's general analysis of the problem, however, recognizing as it does the need for the imposition of limitations on recovery for the foreseeable consequences of an act of negligence, is compatible with our own.[9]
 
 
 51
 In Union Oil, vast quantities of raw crude were released when the defendant oil company negligently caused an oil spill. The oil was carried by wind, wave, and tidal currents over large stretches of the California coast disrupting, among other things, commercial fishing operations. While conceding that ordinarily there is no recovery for economic losses unaccompanied by physical damage, the court concluded that commercial fishermen were foreseeable plaintiffs whose interests the oil company had a duty to protect when conducting drilling operations. The opinion pointed out that the fishermen's losses were foreseeable and direct consequences of the spill, that fishermen have historically enjoyed a protected position under maritime law, and suggested that economic considerations also supported permitting recovery.
 
 
 52
 Yet Union Oil's holding was carefully limited to commercial fishermen, plaintiffs whose economic losses were characterized as "of a particular and special nature." Union Oil, 501 F.2d at 570. The Union Oil panel expressly declined to "open the door to claims that may be asserted by ... other[s] ... whose economic or personal affairs were discommoded by the oil spill" and noted that the general rule denying recovery for pure economic loss had "a legitimate sphere within which to operate." Id.[10]
 
 
 53
 In sum, the decisions of courts in other circuits convince us that Robins Dry Dock is both a widely used and necessary limitation on recovery for economic losses. The holdings in Kinsman and Union Oil are not to the contrary. The courts in both those cases made plain that restrictions on the concept of foreseeability ought to be imposed where recovery is sought for pure economic losses.
 
 
 54
 -6-
 
 
 55
 Jurisprudence developed in the Gulf states informs our maritime decisions. It supports the Robins rule. Courts applying the tort law of Texas, Georgia, Florida, Alabama, Mississippi and Louisiana have consistently denied recovery for economic losses negligently inflicted where there was no physical damage to a proprietary interest.
 
 
 56
 In Rodriquez v. Carson, 519 S.W.2d 214 (Tex.Civ.App.--Amarillo 1975, writ ref'd n.r.e.), the plaintiff truck driver sued for wages he lost when his employer's truck was damaged by the defendant's negligence. The court denied recovery on the ground that there was no duty to the truck driver and explained its decision in terms similar to the Robins rule:
 
 
 57
 [W]e find no breach of a duty owed to appellant by appellee with respect to the injury, i.e., the absence of a truck for appellant to drive. If there were any obligation in this respect, it would arise by reason of some relationship or agreement between the appellant and his employer. The appellant did not suffer any bodily injuries, and in the absence of any showing that he had any vested interest in the truck he did not suffer any injury to personal property.
 
 
 58
 Id. at 216. Similarly, in Morse v. Piedmont Hotel, 110 Ga.App. 509, 139 S.E.2d 133 (1964), the court denied recovery to a plaintiff jewelry salesman who alleged that because the hotel had negligently lost his employer's merchandise--goods for which he was responsible--he lost his job and could no longer obtain insurance policies necessary for employment as a jewelry salesman. The court reasoned that such indirect economic losses were not recoverable where the plaintiff had no property interest in the lost jewels and thus refused to permit recovery for negligent interference with the salesman's business interests. In Ethyl Corp. v. Balter, 386 So.2d 1220 (Fla.Dist.Ct.App.1980), cert. denied, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981), the court stated that it was well-settled in Florida that there was no liability in negligence for interference with economic interests such as contractual or business relationships: "There is no such thing as a cause of action for interference which is only negligently or consequentially effected." Id. at 1224. The courts of Alabama and Mississippi also refuse recovery for wrongful interference with contractual or business interests where the offensive conduct is unintentional. See, e.g., Purcell Co., Inc. v. Spriggs Enterprises, Inc., 431 So.3d 515, 533 (Ala.1983); Cranford v. Shelton, 378 So.2d 652, 655 (Miss.1980).
 
 
 59
 The Supreme Court of Louisiana recently considered abandoning the Robins rule in PPG Industries, Inc. v. Bean Dredging, Inc., 447 So.2d 1058 (La.1984), where a customer of a pipeline owner sued a dredging contractor who negligently damaged the pipeline. The customer's claim was denied. The court explained Robins as based on a policy of avoiding multiplicity of actions and unforseeable extensions of liability. Id. at 1060-61. The court then used those policy considerations to conclude that under a risk-duty analysis the "moral, social and economic values involved" did not warrant extending a duty, and hence liability, to those who might suffer indirect economic losses from an act of negligence. The court did not purport to make a rule for every case, but did suggest that it was "highly unlikely" that indirect economic losses of third parties should ever be recoverable in negligence. Id. at 1061.
 
 IV
 
 60
 Plaintiffs urge that the requirement of physical injury to a proprietary interest is arbitrary, unfair, and illogical, as it denies recovery for foreseeable injury caused by negligent acts. At its bottom the argument is that questions of remoteness ought to be left to the trier of fact. Ultimately the question becomes who ought to decide--judge or jury--and whether there will be a rule beyond the jacket of a given case. The plaintiffs contend that the "problem" need not be separately addressed, but instead should be handled by "traditional" principles of tort law. Putting the problem of which doctrine is the traditional one aside, their rhetorical questions are flawed in several respects.
 
 
 61
 Those who would delete the requirement of physical damage have no rule or principle to substitute. Their approach fails to recognize limits upon the adjudicating ability of courts. We do not mean just the ability to supply a judgment; prerequisite to this adjudicatory function are preexisting rules, whether the creature of courts or legislatures. Courts can decide cases without preexisting normative guidance but the result becomes less judicial and more the product of a managerial, legislative or negotiated function.[11]
 
 
 62
 Review of the foreseeable consequences of the collision of the SEA DANIEL and TESTBANK demonstrates the wave upon wave of successive economic consequences and the managerial role plaintiffs would have us assume. The vessel delayed in St. Louis may be unable to fulfill its obligation to haul from Memphis, to the injury of the shipper, to the injury of the buyers, to the injury of their customers. Plaintiffs concede, as do all who attack the requirement of physical damage, that a line would need to be drawn--somewhere on the other side, each plaintiff would say in turn, of its recovery. Plaintiffs advocate not only that the lines be drawn elsewhere but also that they be drawn on an ad hoc and discrete basis. The result would be that no determinable measure of the limit of foreseeability would precede the decision on liability. We are told that when the claim is too remote, or too tenuous, recovery will be denied. Presumably then, as among all plaintiffs suffering foreseeable economic loss, recovery will turn on a judge or jury's decision. There will be no rationale for the differing results save the "judgment" of the trier of fact. Concededly, it can "decide" all the claims presented, and with comparative if not absolute ease. The point is not that such a process cannot be administered but rather that its judgments would be much less the products of a determinable rule of law. In this important sense, the resulting decisions would be judicial products only in their draw upon judicial resources.
 
 
 63
 The bright line rule of damage to a proprietary interest, as most, has the virtue of predictability with the vice of creating results in cases at its edge that are said to be "unjust" or "unfair." Plaintiffs point to seemingly perverse results, where claims the rule allows and those it disallows are juxtaposed--such as vessels striking a dock, causing minor but recoverable damage, then lurching athwart a channel causing great but unrecoverable economic loss. The answer is that when lines are drawn sufficiently sharp in their definitional edges to be reasonable and predictable, such differing results are the inevitable result--indeed, decisions are the desired product. But there is more. The line drawing sought by plaintiffs is no less arbitrary because the line drawing appears only in the outcome--as one claimant is found too remote and another is allowed to recover. The true difference is that plaintiffs' approach would mask the results. The present rule would be more candid, and in addition, by making results more predictable, serves a normative function. It operates as a rule of law and allows a court to adjudicate rather than manage.[12]
 
 V
 
 64
 That the rule is identifiable and will predict outcomes in advance of the ultimate decision about recovery enables it to play additional roles. Here we agree with plaintiffs that economic analysis, even at the rudimentary level of jurists, is helpful both in the identification of such roles and the essaying of how the roles play. Thus it is suggested that placing all the consequence of its error on the maritime industry will enhance its incentive for safety. While correct, as far as such analysis goes, such in terrorem benefits have an optimal level. Presumably, when the cost of an unsafe condition exceeds its utility there is an incentive to change. As the costs of an accident become increasing multiples of its utility, however, there is a point at which greater accident costs lose meaning, and the incentive curve flattens. When the accident costs are added in large but unknowable amounts the value of the exercise is diminished.
 
 
 65
 With a disaster inflicting large and reverberating injuries through the economy, as here, we believe the more important economic inquiry is that of relative cost of administration, and in maritime matters administration quickly involves insurance. Those economic losses not recoverable under the present rule for lack of physical damage to a proprietary interest are the subject of first party or loss insurance. The rule change would work a shift to the more costly liability system of third party insurance. For the same reasons that courts have imposed limits on the concept of foreseeability, liability insurance might not be readily obtainable for the types of losses asserted here. As Professor James has noted, "[s]erious practical problems face insurers in handling insurance against potentially wide, open-ended liability. From an insurer's point of view it is not practical to cover, without limit, a liability that may reach catastrophic proportions, or to fix a reasonable premium on a risk that does not lend itself to actuarial measurement." James, supra, at 53. By contrast, first party insurance is feasible for many of the economic losses claimed here. Each businessman who might be affected by a disruption of river traffic or by a halt in fishing activities can protect against that eventuality at a relatively low cost since his own potential losses are finite and readily discernible. Thus, to the extent that economic analysis informs our decision here, we think that it favors retention of the present rule.VI
 
 
 66
 Plaintiffs argue alternatively that their claims of economic losses are cognizable in maritime tort because the pollution from the collision constituted a public nuisance, and violated the Rivers and Harbors Appropriation Act of 1899 and Louisiana law. We look to each in turn.
 
 
 67
 -1-
 
 
 68
 Plaintiffs seek to avoid the Robins rule by characterizing their claims as damages caused by a public nuisance.[13] They suggest that when a defendant unreasonably interferes with public rights by obstructing navigation or negligently polluting a waterway he creates a public nuisance for which recovery is available to all who have sustained "particular damages." As defined at common law such damages are those which are substantially greater than the presumed-at-law damages suffered by the general public as a result of the nuisance. See generally Restatement (Second) of Torts Secs. 821B, 821C (1977); Prosser, Private Action For Public Nuisance, 52 Va.L.Rev. 997 (1966). Characterizing the problem as one of public nuisance, however, does not immediately solve the problems with plaintiffs' damage claims for pure economic losses. As Dean Prosser has explained, "courts have not always found it at all easy to determine what is sufficient 'particular damage' to support [a] private action [for a public nuisance], and some rather fine lines have been drawn in the decisions." W. Prosser, Law of Torts Sec. 88 (4th ed. 1971). In drawing such lines today we are unconvinced that we should abandon the physical damage limitation as a prerequisite to recovery for economic loss.
 
 
 69
 The problem in public nuisance theory of determining when private damages are sufficiently distinct from those suffered by the general public so as to justify recovery is as difficult, if not more so, as determining which foreseeable damages are too remote to justify recovery in negligence. In each case it is a matter of degree, and in each case lines must be drawn. With economic losses such as the ones claimed here the problem is to determine who among an entire community that has been commercially affected by an accident has sustained a pecuniary loss so great as to justify distinguishing his losses from similar losses suffered by others. Given the difficulty of this task, we see no jurisprudential advantage in permitting the use of nuisance theory to skirt the Robins rule.
 
 
 70
 Were we to allow plaintiffs recovery for their losses under a public nuisance theory we would permit recovery for injury to the type of interest that, as we have already explained, we have consistently declined to protect. Nuisance, as Dean Prosser has explained, is not a separate tort subject to rules of its own but instead is a type of damage. W. Prosser, Law of Torts Sec. 87 (4th ed. 1971). Our decisions under Robins have emphasized the nature of the interest harmed rather than the theory of recovery. As we noted in Dick Meyers Towing, "[r]ephrasing the claim as a public nuisance claim does not change its essential character." Dick Meyers, 577 F.2d at 1025 n. 4. Thus we conclude that plaintiffs may not recover for pure economic losses under a public nuisance theory in maritime tort.
 
 
 71
 -2-
 
 
 72
 Plaintiffs' arguments that the Rivers and Harbors Appropriation Act affords them an avenue of relief are foreclosed by Supreme Court decision. Plaintiffs suggest that both Section 10 of the Act, which prohibits the obstruction of navigable waters, and Section 13 of the Act, which prohibits the deposit of refuse into navigable waters, have been violated, and that such violations provide a basis for civil liability.[14] In California v. Sierra Club, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), the Court held that the Rivers and Harbors Appropriation Act did not authorize private actions to be brought for violation of its provisions. Accordingly, plaintiffs' claims under the Rivers and Harbors Act may not be maintained.[15]
 
 
 73
 -3-
 
 
 74
 Plaintiffs also urge that their economic losses are recoverable as state law claims in negligence, nuisance or under the Louisiana Environmental Affairs Act of 1980. Because established principles of general maritime law govern the issue of recovery in this case, we reject these state law theories.
 
 
 75
 The claims all involve a collision on a navigable waterway of the United States and the resulting damages, and hence are within the admiralty and maritime jurisdiction of the federal courts. See, e.g., Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). Under the Admiralty Extension Act our jurisdiction extends to the claims for shoreside damages as well as to those directly involving the waterway.[16]
 
 
 76
 It is well-settled that the invocation of federal admiralty jurisdiction results in the application of federal admiralty law rather than state law. See, e.g., Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); Freeport Sulphur Co. v. S/S Hermosa, 526 F.2d 300, 302 n. 2 (5th Cir.1976). While our maritime decisions are informed by common law developments in the state courts, there is no requirement, as in diversity cases, that state law be adopted. Indeed the federal interest in protecting maritime commerce is often best served by the establishment of uniform rules of conduct. We believe that such is the case here. The Robins rule has proved to be a workable and useful tool in our maritime jurisprudence. To permit recovery here on state law grounds would undermine the principles we seek to preserve today. Accordingly, we decline to adopt plaintiffs' state law claims as theories of recovery.
 
 VII
 
 77
 In conclusion, having reexamined the history and central purpose of the doctrine of Robins Dry Dock as developed in this circuit, we remain committed to its teaching. Denying recovery for pure economic losses is a pragmatic limitation on the doctrine of foreseeability, a limitation we find to be both workable and useful. Nor do we find persuasive plaintiffs' arguments that their economic losses are recoverable under a public nuisance theory, as damages for violation of federal statutes, or under state law.
 
 
 78
 Accordingly, the decision of the district court granting summary judgment to defendants on all claims for economic losses unaccompanied by physical damage to property is AFFIRMED.
 
 
 79
 GEE, Circuit Judge, with whom CLARK, Chief Judge, joins, concurring:
 
 
 80
 Both the majority opinion and the dissent do our Court proud, joining a few others on that relatively short list of truly distinguished and thoughtful legal writings of which it or any court can boast. Neither opinion, however, confronts explicitly what is for me the overarching issue in the appeal. That issue, a legal one only in the broadest sense and only implicitly presented, is perhaps best addressed in a brief collateral writing such as this will be.
 
 
 81
 The issue to which I refer is, who should deal with questions of such magnitude as the rule for which the dissent contends would, again and again, draw before the courts? An oil spill damages hundreds, perhaps thousands, of miles of coastal area. A cloud of noxious industrial gas leaks out, kills thousands, and injures thousands more. A commonly-used building material is discovered, years after the fact, to possess unforeseen lethal qualities affecting thousands who have worked with it. The long-term effects of inhaling coal dust are found to be disabling to a significant proportion of veteran miners. None of these illustrations is fanciful; each has arisen in recent times and presented itself for resolution to our body politic. Congress has dealt effectively with Black Lung; it has signally failed to deal with the ravages of asbestosis--a scourge, I suspect, far more general and widespread--and a swelling wave of individual asbestosis claims, to be resolved on a case by case basis, pushes slowly through our court system, threatening to inundate it and to consume in punitive damage awards to early claimants the relatively meager assets available to compensate the general class affected, many of whom have not yet suffered the onset of symptoms.[1] It is my thesis that the dispute-resolution systems of courts are poorly equipped to manage disasters of such magnitude and that we should be wary of adopting rules of decision which, as would that contended for by the dissent, encourage the drawing of their broader aspects before us.
 
 
 82
 An exhaustive study of the deficiencies of applying a mechanism originally developed to decide who owns title to Blackacre, or whether it was Smith or Jones who ran the stop sign in his wagon, to the management of general disasters is beyond either the demands of this writing or the competence and available time of its writer.[2] For today, a few observations and illustrations must serve.
 
 
 83
 I have already noted the probable consequences of attempting to compensate, on a case by case basis, the victims of asbestosis, a class temporally deployed across decades and comprising an open end extending no man knows how far into the future: the compensatory bucket may well be emptied by punitive damages and expenses of litigation long before remote members are even in a position to line up for a compensatory drink. Even considering compensatory damages alone for early claimants, compassionate juries--keenly aware that large percentages of any awards that they make will go for individuals' attorneys' fees and other expenses of their litigation--will likely insure that little of the limited pot will remain to succor late comers. Asbestosis and like disasters cry out for treatment by measures and procedures less limited than those available to such institutions as we.
 
 
 84
 For courts of their nature proceed deductively, reasoning from general principles to particular outcomes in individual disputes. This is so even where class actions are concerned, actions that can offer a partial, but only a partial, relief from the limitations of case by case adjudication, as the situation of the late-maturing asbestosis claims that I have instanced illustrates. Such a system as ours works tolerably well in the traditional case for which it was developed, where the stakes are limited to who owns the farm or to some other finite benefit. Its deficiencies become immediately and painfully apparent, however, when the consideration of factors inherently extraneous to the dispute becomes necessary or desirable to resolving it. Of these factors, perhaps the most often encountered is that of financial reality.
 
 
 85
 The limited resources available to compensate asbestosis victims are only a particular illustration of the intrusion of this factor. The more general problem arises whenever individual courts contemporaneously grant sweeping awards against the same entity, perhaps a governmental one, in unconnected causes. However just each particular award may be, the cumulative effect--produced by individual proceedings to which questions of fiscal limitations and necessary trade-offs are foreign and irrelevant--may be irrational. It follows that we should decline to adopt rules of decision which set ourselves such tasks, tasks that are of their nature beyond our competence to deal with justly. Because I believe that the well-intentioned rule advanced for adoption by the dissent is such a one, and that the rule of the majority roughly and approximately restrains us to matters within the competence of our procedures, I join in the majority opinion.
 
 
 86
 To the contrary of my brother Rubin's observations in separate dissent--with many of which I do not disagree--it is precisely the absence of "physical injury to a proprietary interest" that persuades me we should not embark on the course advocated by the main dissent. For it is just that indefinable which would engage us in the business of massive and general resource allocation, one which I have tried to suggest that we as courts are ill-equipped to conduct.
 
 
 87
 If the rule which Judge Wisdom espouses were one written in stone, I would be the first to enforce it by whatever means and procedures, inadequate or no, were available. That is not the question. The question is whether we should ourselves adopt such a rule and then proceed to apply it. My answer is that since I do not believe we are capable of administering such a procedure justly, we should not set ourselves the task. Nor am I so clear as my dissenting brethren seem to be about where the high ground lies in these premises. Extending theories of liability may not always be the more moral course, especially in such a case as this, where the extension, in the course of awarding damages to unnumbered claimants for injuries that are unavoidably speculative, may well visit destruction on enterprise after enterprise, with the consequent loss of employment and productive capacity which that entails.
 
 
 88
 JERRE S. WILLIAMS, Circuit Judge, concurring specially:
 
 
 89
 My brother Higginbotham in his opinion for the Court correctly points out in footnote 10 that the issue of liability to the commercial fishermen who were financially injured because of this ship collision and resultant spillage is not before us and is an undecided issue in this Circuit.
 
 
 90
 I am not in serious disagreement with the Court's approach on this issue as set out in the footnote. I write for purposes of emphasis more than to differ. My concern is that I have considerable doubt that commercial fishermen can establish a proprietary interest in the right to fish in their fishing waters. Certainly the common legal synonym for "proprietary interest" is "ownership", as legal lexicons attest. Yet the bright line rule of the Court's opinion places emphasis upon a requisite proprietary interest.
 
 
 91
 It would be preferable, in my view, to have the rule include a clear recognition that the rights of commercial fishermen were more accurately defined by the Court in Union Oil Co. v. Oppen, 501 F.2d 558 (9th Cir.1974), one of the cases discussed by Judge Higginbotham. The Court agreed that ordinarily there is no recovery for economic losses unaccompanied by physical damage. It found, however, that commercial fishermen were foreseeable plaintiffs whose interests the oil company had a duty to protect when conducting its operations which resulted in the spillage. The rule that should prevail was effectively stated by Judge Sneed in that case in the quotation set out in Judge Higginbotham's opinion. I repeat it here for emphasis:
 
 
 92
 Nothing said in this opinion is intended to suggest, for example, that every decline in the general commercial activity of every business in the Santa Barbara area following the occurrences of 1969 constitutes a legally cognizable injury for which the defendants may be responsible. The plaintiffs in the present action lawfully and directly make use of a resource of the sea, viz, its fish, in the ordinary course of their business. This type of use is entitled to protection from negligent conduct by the defendants in their drilling operations. Both the plaintiffs and defendants conduct their business operations away from land and in, on and under the sea. Both must carry on their commercial enterprises in a reasonably prudent manner. Neither should be permitted negligently to inflict commercial injury on the other. We decide no more than this. (Emphasis added.) 501 F.2d at 570.
 
 
 93
 The commercial fishermen properly recover because their livelihood comes from a "resource" of the water which was polluted. Yet, physical property owned by them was not damaged and it is doubtful that a proprietary interest could have been shown.
 
 
 94
 I recognize that the Court's opinion in footnote 10 accepted Union Oil as a possible alternative analysis as to the rights of the commercial fishermen. I write to give it greater emphasis than is to be found in the footnote reference and to stress it as the more realistic alternative than a proprietary interest analysis. I would prefer that the rule be stated with enough additional breadth to allow recovery for those who are damaged because they make their living out of a "resource" of the water.
 
 
 95
 I concur fully in the result in this case because I am in full agreement with the decision of the Court as to all the claimants who are before us. But I have the reservation expressed above as to the rule of law which is stated in the Court's opinion.
 
 
 96
 GARWOOD, Circuit Judge, concurring specially.
 
 
 97
 I join in the affirmance of the judgment below substantially for the reasons so well stated in Judge Higginbotham's cogent opinion, with which I am in general agreement. I particularly agree with its analysis of the insufficiency of the proximate cause, foreseeability and remoteness formulations to alone provide an adequate guide for distinguishing, on a normative, pre-event basis, between the classes of cases in which recovery will be allowed and those in which it will not. And I concur, for the reasons ably stated by Judge Higginbotham, in the view that physical harm to or invasion of a proprietary interest is generally an appropriate condition for recovery of negligently caused economic loss, and that the "particular damage" theory of public nuisance law, at least if broadly read, is not an adequate substitute, as it suffers in this respect from deficiencies analogous to those of the proximate cause, foreseeability and remoteness formulations. As the Court's opinion correctly states, to allow appellants "recovery for their losses under a public nuisance theory ... would permit recovery for injury to the type of interest that ... we have consistently declined to protect."* And I believe we wisely leave to one side the claims of the commercial fishermen, who are not before us. I write separately only to explicitly suggest what seems implicit in the Court's opinion, namely, that the physical harm or invasion requirement may not be inflexible or without exception, and that, in certain unusual instances, a relatively restrictive application of the public nuisance theory of damage or invasion different in kind, rather than degree, or something analogous thereto, may be an appropriate substitute. I am in full accord with the desirability of a general rule in accordance with the principles stated by Judge Higginbotham, and for the reasons he articulates. However, we need not in this case either foreclose, or define the precise contours of, possible rare exceptions.
 
 
 98
 WISDOM, Circuit Judge, with whom ALVIN B. RUBIN, POLITZ, TATE, and JOHNSON, Circuit Judges, join, dissenting.
 
 
 99
 Robins is the Tar Baby of tort law in this circuit. And the brier-patch is far away. This Court's application of Robins is out of step with contemporary tort doctrine, works substantial injustice on innocent victims, and is unsupported by the considerations that justified the Supreme Court's 1927 decision.
 
 
 100
 Robins was a tort case grounded on a contract. Whatever the justification for the original holding, this Court's requirement of physical injury as a condition to recovery is an unwarranted step backwards in torts jurisprudence. The resulting bar for claims of economic loss unaccompanied by any physical damage conflicts with conventional tort priniciples of foreseeability and proximate cause. I would analyze the plaintiffs' claims under these principles, using the "particular damage" requirement of public nuisance law as an additional means of limiting claims. Although this approach requires a case-by-case analysis, it comports with the fundamental idea of fairness that innocent plaintiffs should receive compensation and negligent defendants should bear the cost of their tortious acts. Such a result is worth the additional costs of adjudicating these claims, and this rule of liability appears to be more economically efficient. Finally, this result would relieve courts of the necessity of manufacturing exceptions totally inconsistent with the expanded Robins rule of requiring physical injury as a prerequisite to recovery.
 
 I. ALTERNATE STATEMENT OF THE CASE
 A. Factual Background
 
 101
 On July 22, 1980, at 8:44 p.m., the inbound bulk carrier M/V Sea Daniel collided with the outbound container ship M/V Testbank at Mile 41 of the Mississippi River Gulf Outlet Channel. This channel is a 66-mile, man-made shortcut between New Orleans and the Gulf of Mexico. Immediately following the collision, a cloud of hydrobromic acid mist enveloped the ships from ruptured containers onboard the Testbank. The prevailing winds carried the acid cloud to Shell Beach, Louisiana, a little town downwind of the collision. The collision damaged several containers on the Testbank, which were then lost overboard. One of these containers held about twelve tons of pentachlorophenol (PCP) in fifty-pound bags.[1] This was the largest PCP spill in United States history.
 
 
 102
 The same day, Civil Defense and local authorities evacuated all residents within a ten-mile radius of the collision. The Coast Guard closed the Outlet to vessel navigation.[2] Health officials suspended all fishing, shrimping, and associated activities on the Outlet and within about 400 square miles of surrounding Louisiana waterways and marshes. They also embargoed seafood and shellfish caught in the area and widely broadcast notice of this embargo. The closure and suspensions lasted through mid-August.
 
 
 103
 The commercial fishing industry in the area sustained serious losses, primarily from the depressed market in that industry in southern Louisiana. Other businesses suffered losses. Numerous parties filed suit against the vessels and their owners, seeking compensation for their expenses and their lost profits caused by the collision, pollution, and bans to navigation and fishing. The claimants may be classified as follows:
 
 
 104
 (1) commercial fishermen, crabbers, oystermen, and shrimpers who routinely operated in and around the closed area;
 
 
 105
 (2) fishermen, crabbers, oystermen, and shrimpers who engaged in these practices only for recreation;
 
 
 106
 (3) operators of marinas and boat rentals, and marine suppliers;
 
 
 107
 (4) tackle and bait shops;
 
 
 108
 (5) wholesale and retail seafood enterprises not actually engaged in fishing, shrimping, crabbing, or oystering in the closed area;
 
 
 109
 (6) seafood restaurants;
 
 
 110
 (7) cargo terminal operators;
 
 
 111
 (8) an operator of railroad freight cars seeking demurrage;
 
 
 112
 (9) vessel operators seeking expenses (demurrage, crew costs, tug hire) and losses of revenues caused by the closure of the outlet.
 
 
 113
 In its decision and judgment entered in State of Louisiana ex rel. Guste v. M/V Testbank, E.D.La.1981, 524 F.Supp. 1170, aff'd, 728 F.2d 748 (per curiam), the district court dismissed the claims of shipping interests, marine and boat rental operators, wholesale and retail seafood enterprises not actually engaged in fishing, seafood restaurants, tackle and bait shops, and recreational fishermen. On February 22, 1982, a panel of this Court heard oral argument, and that panel affirmed the decision of the district court, holding that it was bound by Robins and by Akron Corp. v. M/T Cantigny, 5 Cir.1983, 706 F.2d 151 (per curiam). See State of Louisiana ex rel. Guste v. M/V Testbank, 5 Cir.1984, 728 F.2d 748 (per curiam). Now a majority of our Court en banc has affirmed that determination.
 
 B. The Fifth Circuit's Extensions of Robins
 
 114
 This Court's most recent extension of Robins, and one that is squarely on point with the present case, is Akron Corp. v. M/T Cantigny, 5 Cir.1983, 706 F.2d 151 reh'g denied, 5 Cir.1983, 711 F.2d 1054. In Akron, a ship grounded in the Southwest Pass of the Mississippi River, blocking large vessel traffic from entering or leaving the river for several days. Owners and charterers of vessels blocked by the closure of the pass sued for demurrage, additional fuel expenses, tug hire, pilot fees, and other delay expenses. This Court denied recovery:
 
 
 115
 "Robins stands for the proposition that a party may not recover for economic losses not associated with physical damages. Id. The rule's purpose is to prevent limitless liability for negligence and the filing of law suits of a highly speculative nature. This court noted in Bayou Lacombe [5 Cir.1979, 597 F.2d 469] that '[w]hatever the wisdom of the traditional rule of nonliability for negligent acts causing economic loss, Robins reflects the state of law in this circuit,' 597 F.2d at 472."
 
 
 116
 706 F.2d at 153 (emphasis added).
 
 
 117
 In Dick Meyers Towing Service, Inc. v. United States, 5 Cir.1978, 577 F.2d 1023, cert. denied, 1979, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455, this Court denied recovery for losses after navigation on the Black Warrior River in Alabama was completely halted for five months by a faulty lock near the Bankhead Dam. Meyers sued for recovery of the loss of towing business sustained as a result of the closing of the river. This Court affirmed the district court's denial of recovery, relying on Robins and Kaiser Aluminum & Chemical Corp. v. Marshland Dredging Co., 5 Cir.1972, 455 F.2d 957:
 
 
 118
 "The law has traditionally been reluctant to recognize claims based solely on harm to the interest in contractual relations or business expectancy.... In consequence, as stated in Kaiser Aluminum, a plaintiff may not recover for interference with his contractual relations unless he shows that the interference was intentional or knowing. While the wisdom of that traditional reluctance is open to debate, the rule based upon it is too well-settled to be overturned by a panel of this court."
 
 577 F.2d at 1025.[3]
 
 119
 Finally, in Louisville and Nashville Railroad Co. v. M/V Bayou Lacombe, 5 Cir.1979, 597 F.2d 469, L & N Railroad sought recovery for loss of use of a railroad bridge damaged by the Bayou Lacombe. Although L & N did not own the bridge, it sought to place itself in the same position as the owner of the bridge through its contractual agreement with the bridge's actual owner. The Court found that the agreement placed no ownership interest in the L & N. Therefore, under Robins, as construed by this Court, L & N had no right to recover. The damages allegedly sustained were losses of an economic expectancy and not proprietary losses. Id. at 474.[4]
 
 
 120
 The enduring appeal of Robins, despite its inapplicability to cases such as this one, seems to spring from the administrative convenience of a "conspicuous bright-line rule" and from "the virtue of predictability". Majority opinion at 1029. In a frequently cited extension of Robins, an Ohio Court of Appeals was remarkably candid in its justification for relying on Robins. Stevenson v. East Oil & Gas Co., Ohio Ct.App. 1946, 73 N.E.2d 200. In Stevenson a defendant negligently obstructed a factory building, necessitating a large-scale lay-off. The court felt that it would be impossible to draw a workable line of liability between workers out of their jobs and restaurant owners supplying the workers' lunches:
 
 
 121
 "While the reason usually given for the refusal to permit recovery in this class of cases is that the damages are 'indirect' or are 'too remote' it is our opinion that the principal reason that has motivated the courts in denying recovery in this class of cases is that to permit recovery of damages in such cases would open the door to a mass of litigation which might very well overwhelm the courts so that in the long run while injustice might result in special cases, the ends of justice are conserved by laying down and enforcing the general rule so well stated by Mr. Justice Holmes...."
 
 73 N.E.2d at 202.[5]
 
 122
 Our notions of proximate cause and foreseeability are admittedly less adequate in truncating a chain of claims where the conduit through which the harm passes is contract. If a contract between A and B provides sufficient nexus for B to recover after A 's physical injury, then it is difficult to distinguish C 's contract with B, or D 's contract with C. In short, one contract seems as good as the next for establishing proximate cause and foreseeability once the first claim is allowed. Robins resolves this dilemma by disallowing all third party claims based solely upon a contractual relationship with the injured party.[6]
 
 
 123
 There are sound reasons for such a rule. Courts recognize that once they permit recovery for economic loss to parties linked in a serial chain of contracts, defining a stopping point becomes nearly impossible. In Robins, for example, the shipowner had settled his claim against the drydocker, apparently for the rents the shipowner would have received from the charterer had there not been an additional delay. Robins, 2 Cir.1926, 13 F.2d 3, 4. Had Justice Holmes imposed liability again in the Robins appeal for the charterer's lost profits, the tortfeasor would have been required to make good the still better bargain of the charterer. Similarly, if the charterer had a contract with parties on shore to clean the charterer's catch, the drydock would have been required to make good on this bargain as well. This iteration of compensation could conceivably run without limit. Liability would accrue "in an indeterminate amount for an indeterminate time to an indeterminate class". Ultramares Corp. v. Touche, N.Y. 1931, 255 N.Y. 170, 179, 174 N.E. 441, 444 (Cardozo, C.J.).[7] In limiting recovery in a chain of contractual relations, the Supreme Court drew the line after the first claim for damages. Justice Holmes had thus fashioned a rule in claims arising from a chain of contracts that would avoid a multiplicity of actions and prevent a vast extension of liability.[8] As one commentator observed:
 
 
 124
 "In a situation of this type, total recovery for all lost profits might amount to an enormous sum, and the Robins Court may have thought that liability of this magnitude would unduly discourage socially useful but risky undertakings. However, by arbitrarily cutting off liability after the most proximately-related party, the courts following Robins have indicated their doubt that the traditional limits of the duty concept, the doctrine of proximate cause, and the jury's discretion are adequate to prevent excessive recovery. For the sake of certainty, these courts have sacrificed the fairness of a case-by-case determination of the appropriateness of recovery."
 
 
 125
 Note, Negligent Interference with Contract: Knowledge as a Standard for Recovery, 63 Va.L.Rev. 813, 820 (1977).
 
 
 126
 II. THE INAPPLICABILITY OF Robins Dry Dock TO THIS CASE
 
 
 127
 Whatever the pragmatic justification for the original holding in Robins, the majority has extended the case beyond the warrant of clear necessity in requiring a physical injury for a recovery of economic loss in cases such as the one before the court. Robins prevented plaintiffs who were neither proximately nor foreseeably injured by a tortious act or product from recovering solely by claiming a contract with the injured party. The wisdom of this rule is apparent. This rule, however, has been expanded now to bar recovery by plaintiffs who would be allowed to recover if judged under conventional principles of foreseeability and proximate cause.[9]
 
 
 128
 A. The Precise Holding of Robins Applies Only to Claims for Negligent Interference with Contract.
 
 
 129
 Because the centerpiece of this litigation has been Robins,[10] the holding of this oftcited case merits scrutiny. A ship's time charterer was required under contract to turn the vessel over to a dry dock for maintenance. The charterer owed no rent during the time the ship was under repair. The drydocker, who had contracted with the owner of the ship for the work, negligently damaged the ship's propeller. During the additional delay caused by repairs to the propeller, the charterer lost expected profits from the use of the ship. The charterer sued the shipyard for these economic losses. The Supreme Court denied relief, holding that the shipyard's damage to the propeller wronged only the owner of the ship. The Court further held that the charterer had lost merely the benefit of his contract for hire and had suffered no legally cognizable claim:
 
 
 130
 "[The plaintiff's] loss arose only through [its] contract with the owners--and while intentionally to bring about a breach of contract may give rise to a cause of action, no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong. The law does not spread its protection so far."
 
 
 131
 275 U.S. at 308-09, 48 S.Ct. at 135, 72 L.Ed. at 292 (citations omitted).
 
 
 132
 Robins held only that if a defendant's negligence injures party A, and the plaintiff suffers loss of expected income or profits because it had a contract with A, then the plaintiff has no cause of action based on the defendant's negligence.
 
 B. Difficulties with Subsequent Extensions
 
 133
 It is a long step from Robins to a rule that requires physical damage as a prerequisite to recovery in maritime tort. The majority believes that the plaintiff's lack of any contractual connection with an injured party, taken with the Robins rule, forecloses liability: "If a plaintiff connected to the damaged chattels by contract cannot recover, others more remotely situated are foreclosed a fortiori." Majority opinion at 1024. This conclusion follows readily from the reasoning that if uninjured contracting parties are barred from recovery, and if contracting parties have a closer legal relationship than non-contracting parties, then a party who is not physically injured and who does not have a contractual relation to the damage is surely barred.
 
 
 134
 This argument would be sound in instances where the plaintiff suffered no loss but for a contract with the injured party. We would measure a plaintiff's connection to the tortfeasor by the only line connecting them, the contract, and disallow the claim under Robins. In the instant case, however, some of the plaintiffs suffered damages whether or not they had a contractual connection with a party physically injured by the tortfeasor. These plaintiffs do not need to rely on a contract to link them to the tort: The collision proximately caused their losses, and those losses were foreseeable. These plaintiffs are therefore freed from the Robins rule concerning the recovery of those who suffer economic loss because of an injury to a party with whom they have contracted.
 
 
 135
 Because Robins provides an overly restrictive bar on recovery, courts have over the years developed a number of exceptions.[11] The traditional exceptions allow recovery for certain husband-wife claims,[12] recovery for negligent interference with contract when the interference results from a tangible injury to the contractor's person or property,[13] and recovery for persons employed on fishing boats to recover for lost income when the employment contract is disrupted by a third party's negligent injury to the ship or equipment.[14]
 
 
 136
 Many opinions go beyond these traditional exceptions, both in the Fifth Circuit and in other courts. Our own Court has allowed a plaintiff to recover the added costs of performing a contract caused by a defendant's negligence,[15] and has employed this exception for maritime torts.[16] This Court also allowed a plaintiff to recover added costs in J. Ray McDermott & Co. v. S.S. Egero, 5 Cir.1972, 453 F.2d 1202, when a prime contractor recovered liquidated damages to a subcontractor after a vessel negligently dropped anchor on or near the pipelines which the contractor was constructing across a river bottom.[17] Canadian cases have also allowed recovery of additional expenses.[18]
 
 
 137
 Although the majority says that this Court has not "been the sole guardian of the Robins Dry Dock principle", the majority's support[19] is reminiscent of the Potemkin Village set up for Catherine the Great to visit. In both the Second and the Fourth Circuits courts have recently limited the applicability of the Robins rule in maritime torts.
 
 
 138
 The Second Circuit's opening volley on Robins was Petition of Kinsman Transit Co., 2 Cir.1968, 388 F.2d 821 (Kinsman II ), which has effectively limited the applicability of Robins to a small number of maritime torts. See Federal Commerce & Navigation Co. v. M/V Marathonian, S.D.N.Y.1975, 392 F.Supp. 908, aff'd, 2 Cir.1975, 528 F.2d 907 (per curiam), cert. denied, 1976, 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799. The import of Kinsman II was to establish foreseeability as the test for liability instead of the requirement of physical injury.[20] The court rejected the requirement of physical damages without even bothering to distinguish Robins, and instead relied on customary negligence principles. Id. at 823-34. Although the Court in Kinsman II found that the damages were too "tenuous and remote" to allow recovery, the opinion represents an important departure from Robins because the Court was willing to rely on a case-by-case application of proximate cause principles rather than the blanket bar of Robins.[21] There is therefore no basis for the majority to say that Kinsman II's "general analysis ... is compatible with our own".
 
 
 139
 Federal Commerce & Navigation Co. v. M/V Marathonian, S.D.N.Y.1975, 392 F.Supp. 908, aff'd, 2 Cir.1975, 528 F.2d 907 (per curiam), cert. denied, 1976, 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799, also belies a blanket approval of Robins in the Second Circuit. In Marathonian, both the district court and the court of appeals reluctantly dismissed the plaintiffs' claims, but made it clear that the holding was narrow and was compelled by Robins in "instances involving the factual contours of that case". In its opinion, the district court stated:
 
 
 140
 "[W]ere this Court now free to write upon a tabula rasa and not constrained by the weight of precedent, we would reject the negligent interference with contract doctrine in favor of a negligence-causation-foreseeability analysis, such as that adopted by Chief Judge Kaufman in Petition of Kinsman Transit Co., 388 F.2d 821, 823-34 (2 Cir.1968)....
 
 
 141
 * * *
 
 
 142
 "In the instant case, however, we feel bound by the Supreme Court's decision in Robins. We believe that the Robins decision must be adhered to by the lower federal courts, at least in instances involving the factual contours of that case, namely the negligent interference with a time charterer's contract rights by third parties, until such time as the Supreme Court directs otherwise."
 
 392 F.Supp. at 913, 915.[22]
 
 143
 In the Fourth Circuit, District Judge Merhige refused to dismiss claims for economic losses suffered by commercial fishermen, local boat, and tackle and bait shop owners, but did dismiss claims by the plaintiffs who purchased and marketed seafood from commercial fishermen. Those losses, although foreseeable, were too indirect. Pruitt v. Allied Chemical Corp., E.D.Va.1981, 523 F.Supp. 975.
 
 
 144
 Finally, the ramparts have been breached in the Ninth Circuit. Although the majority says that Union Oil Co. v. Oppen, 9 Cir.1974, 501 F.2d 558, is "not contrary" to our Court's affirmation of the Robins rule, a close reading of Oppen indicates that this is incorrect. In Oppen, a mishap in 1969 at an offshore oil drilling platform introduced hundreds of thousands of gallons of oil into the ocean off the coast of Santa Barbara, California. Although a strict application of the extensions of Robins would have barred all recovery, the Ninth Circuit allowed fishermen to recover for the loss of their livelihood. After acknowledging the "widely recognized principle" that a plaintiff could not recover for the negligently induced loss of "a prospective pecuniary advantage", id. at 563, the Court noted the many exceptions to this rule, "in which defendants engaged in certain professions, businesses, or trades have been held liable for economic losses resulting from the negligent performance of tasks within the course of their callings", id. 566. The Court regarded the real question to be whether Union owed a duty to the fishermen. This in turn depended on whether Union could foresee a risk of harm to fishermen:
 
 
 145
 [W]e can not escape the conclusion that under California law the presence of a duty on the part of the defendants in this case would turn substantially on foreseeability. That being the crucial determinant, the question must be asked whether the defendants could reasonably have foreseen that negligently conducted drilling operations might diminish aqautic life and thus injure the business of commercial fishermen. We believe the answer is yes.
 
 Id. at 569 (emphasis added).[23]
 
 146
 Recently, the Robins holding has been undermined in Louisiana. In PPG Industries, Inc. v. Bean Dredging, La.1984, 447 So.2d 1058, the Court held that the dredging contractor who damaged a natural gas line was not liable for the added expenses incurred by the only user of the line. But the Court did not rely on a bright-line physical damage requirement, and criticized earlier Louisiana cases for "taking a mechanical approach to [an] unreasoned conclusion". Id. at 1060. The Court said that although Robins is usually cited for the proposition that negligent interference with contract is not a tort, Robins is better justified as responding to the need to prevent multiple actions and unforeseeable liability. The Court went on to hold that the particular risk at issue in the case--the risk of shutting down the plaintiff's factory--was not encompassed by the defendant's duty of care. Justice Calogero dissented, arguing that the risk was within the duty, but he first "applaud[ed] the majority's ... abandoning the per se exclusion of [economic] damages which our courts have heretofore adopted on the heels of Robins." Id. at 1062.
 
 
 147
 One cannot deny that Robins's policy of limiting the set of plaintiffs who can recover for a person's negligence and damage to physical property provides a "bright line" for demarcating the boundary between recovery and nonrecovery. Physical harm suggests a proximate relation between the act and the interference. At bottom, however, the requirement of a tangible injury is artificial because it does not comport with accepted principles of tort law. Mrs. Palsgraf, although physically injured, could not recover. Many other plaintiffs, although physically uninjured, can recover.[24]
 
 
 148
 The inapplicability of Robins to plaintiffs who have been proximately and foreseeably injured by the collision illustrates the fundamental weakness of founding a rule of recovery in tort upon Robins. Conventional tort principles do not apply in Robins because the connection between the plaintiff and the tort was a contract, not a tortious act or a defective product. In cases where the parties have suffered losses only because they are parts of a chain of contracting parties, only one of whom was physically injured, Robins provides a bright-line rule to limit claims. Whatever the justification for this rule in its original context, however, we should not extend it to instances where the parties are not linked merely in a contractual chain. Instead, we should allow recovery in instances where each of the parties alleges a loss that occurred outside this contractual chain, where each injured party, isolated from another injured party, can assert an injury that is cognizable when judged by our usual rules of proximate cause and foreseeability.[25] There is only one justification for the requirement of physical injury: If Robins establishes a policy of restricting the type of plaintiff who can recover for a defendant's negligence, physical property damage furnishes an easily discernible boundary between recovery and nonrecovery.
 
 
 149
 With deference to the majority, I suggest, notwithstanding their well reasoned opinion, that the utility derived from having a "bright line" boundary does not outweigh the disutility caused by the limitation on recovery imposed by the physicaldamage requirement. Robins and its progeny represent a wide departure from the usual tort doctrines of foreseeability and proximate cause. Those doctrines, as refined in the law of public nuisance, provide a rule of recovery that compensates innocent plaintiffs and holds the defendants liable for much of the harm proximately caused by their negligence.
 
 III. AN ALTERNATE RULE OF RECOVERY
 
 150
 Rather than limiting recovery under an automatic application of a physical damage requirement, I would analyze the plaintiffs' claims under the conventional tort principles of negligence, foreseeability, and proximate causation.[26] I would confine Robins to the "factual contours" of that case: A plaintiff's claim may be barred only if the claim is derived solely through contract with an injured party. The majority's primary criticism of this approach to a determination of liability is that it is potentially open ended. Yet, there are well-established tort principles to limit liability for a widely-suffered harm. Under the contemporary law of public nuisance, courts compensate "particularly" damaged plaintiffs for harms suffered from a wide-ranging tort, but deny recovery to more generally damaged parties. Those parties who are foreseeably and proximately injured by an oil spill or closure of a navigable river, for example, and who can also prove damages that are beyond the general economic dislocation that attends such disasters should recover whether or not they had contractual dealings with others who were also damaged by the tortious act. The limitation imposed by "particular" damages, together with refined notions of proximate cause and forseeability, provides a workable scheme of liability that is in step with the rest of tort law, compensates innocent plaintiffs, and imposes the costs of harm on those who caused it.[27]A. Public Nuisance Law and Particular Damages
 
 
 151
 To assert a cause of action under public nuisance law, a plaintiff must assert "particular damages".[28] As Dean Prosser, Reporter for the Second Restatement of Torts, has written, although courts once required physical injury for a recovery under nuisance, this limitation was quickly abandoned:
 
 
 152
 "The origin of this notion is obscure, although there is an obvious derivation from the old distinction between the actions of trespass and case. It has been expressly repudiated often enough; and the whole tenor of the cases in which particular damage has been found makes it quite clear that it is not now the law, if indeed it ever was."
 
 
 153
 Prosser, Private Action for Public Nuisance, 52 Va.L.Rev. 997, 1007-08 (1966).
 
 
 154
 Instead, to state a cause of action under public nuisance, a plaintiff must prove "particular" damages from the alleged wrong. These damages must be different in kind and degree from those suffered by the general public. If other individuals suffer the same kind of damage, although in lesser degree, a private plaintiff might still recover. Id. at 1009. "It is only when the class becomes so large and general as to include all members of the public who come in contact with the nuisance, that the private action will fail." Id.
 
 
 155
 Generally, pecuniary loss to the plaintiff results in particular damage that sets him apart from the general public. When the plaintiff is prevented from performing a specific contract, or is put to additional expense in performing it, he can maintain his action because the contract is an individual matter that is not common to the public. Id. Also, those who have established businesses which make common use of the public right that the nuisance infringes have been allowed recovery. When a river is blocked, for example, a steamboat line operating on it and a company that rafts logs or collects tolls for passage have been permitted to maintain the action.[29] There are also cases in which commercial fisheries making a localized use of public waters have been allowed to recover under nuisance law.[30] And although plaintiffs who are delayed by a public nuisance cannot recover money for the delay itself (e.g., the profitable opportunities that the plaintiff had to forego), they can recover for actual additional expenses, such as extra fuel, additional crew expenses, and greater demurrage charges.[31]
 
 
 156
 The Supreme Court of Louisiana has recognized that a business may sustain the requisite "particular kind of business damages as a consequence of the obstruction of a navigable channel". Pharr v. Morgan's L. & T.R. & S.S. Co., La.1905, 115 La. 138, 38 So. 943. In that case, the defendant had negligently damaged a railroad bridge spanning the Atchafalaya River. The barges could pass under the repair framework, but the steamboat could not. The plaintiff was forced to employ an extra steamboat to transport the sugar cane from the sugar fields below the bridge to the refinery above the bridge. Id., 38 So. at 944. The Court held:
 
 
 157
 "The negligent breaking of the bridge was the primary, paramount cause, which lead to the obstruction of navigation as well as the work of reparation; and if, as argued, such work was the immediate cause of the injury, it was simply an intervening cause set in motion by the party originally in fault. It may be said that the remedy was worse than the disease.
 
 
 158
 "We therefore are of opinion that defendants are responsible in damages caused by the obstruction of navigation."
 
 
 159
 Id. at 945. The Louisiana Supreme Court awarded damages for the extra transportation costs incurred, but refused to award delay damages because of the uncertainty of the evidence; the plaintiff would have been entitled to such damages had he been able to prove them.
 
 
 160
 The closest federal case in point is probably Burgess v. M/V Tamano, D.Me.1973, 370 F.Supp. 247, aff'd, 1 Cir. 1977, 559 F.2d 1200. There, the court denied the plaintiff's motion to dismiss the claims of fishermen and clam diggers seeking damages as a result of an oil spill in a Maine bay. The court decided the motion for dismissal on the basis of public nuisance, holding that the commercial fishermen and clam diggers had suffered "particular damage different in kind, rather than degree, from that asserted by the general public". The court denied recovery to businessmen in Old Orchard Beach because their damage was "derivative from that of the public at large, is common to all businesses and residents of the Old Orchard Beach area". Id. at 251.
 
 
 161
 The line of demarcation provided by the Burgess court under an analysis of public nuisance and the line suggested in this dissent are similar. Those who incur a direct pecuniary loss (and thus fall within the field of "particular damages") will frequently also have been injured both proximately and foreseeably by the spill. Ships bottled up in the Mississippi River that had to pay additional crew expenses and docking and demurrage charges, for example, would recover these expenses. Similarly, fishermen would be entitled to compensation for the loss of their livelihood.B. Applications of the Alternate Rule of Recovery
 
 
 162
 Although the requirement of "particular" damages provides a useful means of limiting claims, it must be applied within the general framework of the long-standing requirements of proximate cause and foreseeability. It is, of course, axiomatic in tort law that those who have been proximately and foreseeably injured should recover. Although cause and effect can be carried to limitless and unknowable lengths, courts have chosen to deal with these concepts in a restrained manner that is practical and within the scope of ordinary human understanding. These arbitrary limits are delineated by "proximate" or "natural" causes. One must admit that the line between recovery and nonrecovery may appear as arbitrary under a rule of proximate cause as a line created by a requirement for physical damages. In a sense, any line that the courts draw to limit recovery is arbitrary. But this dissent attempts to draw lines which comport more closely with principles of intrinsic fairness than the line based on physical damage.
 
 
 163
 1. Requirements of Proximate Cause, Foreseeability, and "Particular" Damage
 
 
 164
 First, the damage must be proximately caused by the accident. Although this requirement will preclude some claims, it provides relief for many of the claims for economic losses at issue here because of the great interdependence of the elements in the maritime industry. Hardly any claim escapes its imprimatur, and its overinclusiveness in defining the class of proper plaintiffs in this case limits its traditional utility. We therefore concentrate instead on the principles of foreseeability and "particular" damage, which are more useful here in delimiting recovery.
 
 
 165
 Foreseeability provides a mechanism for limiting claims that are proximately related to the accident. The requirement of foreseeability precludes recovery for damages resulting from gains that are allegedly lost because the accident altered the course of events upon which the expected gain was predicated. For example, the law should not compensate a shipper for purely speculative profits. Such predictions of the future are limitless in variety and incalculable in scope. Foreseeability requires that we confine the scope of claims to those arising from activities in process at the time of the accident or to claims that can be proven with certainty.
 
 
 166
 Finally, a plaintiff must assert a "particular" damage that distinguishes him from the general population. This requirement of "particular" damage basic in the law of public nuisance developed as a response to widespread losses. It was formulated to compensate those plaintiffs most seriously aggrieved by a tort while preventing open-ended liability. The distinction is useful here. In a maritime accident, a business suffers "particular" damages to the extent that the accident prevents the business from engaging in primary maritime activities, such as fishing or use of the waterways, or supplying commodities or services vital to primary maritime activities, such as those of bait and tackle shops, drydocks, marinas, and seafood wholesalers or processors. All other losses that are not peculiar to maritime activities are part of the general economic dislocation caused by the accident and are therefore not "particular".
 
 
 167
 A plaintiff must meet all three criteria for recovery. This test should provide a reasonably satisfactory equilibrium among compensation to plaintiffs, foreclosure of open-ended liability, and imposition of incentives on defendants to obtain insurance and to exercise due care.
 
 
 168
 2. Parties Entitled To Recover Under the Test
 
 
 169
 Shrimpers, crabbers, oystermen, and other commercial fishermen who routinely operated in those parts of the Mississippi River Gulf Outlet and the surrounding areas that were temporarily closed by the Coast Guard should recover. It is foreseeable that a ship carrying PCP might be in a collision and that some of the PCP containers might be lost overboard.[32] It is also foreseeable that a PCP spill would result in the closure of fishing areas. Commercial fishermen have suffered damages that are proximately caused by this closure. Finally, they have suffered "particular" damages because, unlike members of the general public, the tort has denied them their livelihood in the maritime industry.
 
 
 170
 Ships that were trapped or delayed by the closure of the Gulf Channel Outlet are also entitled to recovery. It is foreseeable that a PCP spill would result in closure of the river to navigation. Such closure proximately caused shippers to incur additional expenses. The damage is "particular" because the operators of these ships have incurred additional pecuniary outlays in the course of their maritime activities.[33] Ships that can alter their routes to reduce or eliminate losses should be denied recovery pro tanto because of their duty to mitigate damages. See Hercules, 720 F.2d at 1201 (per curiam), aff'd, 11 Cir. 1984, 728 F.2d 1359 (en banc). If the rerouting of ships caused delays in an alternate route from crowding, ships that would have taken the alternate route in any event should not recover their delay expenses.
 
 
 171
 The land-based businesses that have claimed damages include drydocks, marinas, bait and tackle shops, seafood processors, seafood wholesalers, and restaurants. It is here that drawing the line becomes difficult, for these businesses have been affected by the PCP spill, but all would agree that a seafood restaurant in New Orleans should not recover for a loss of business from consumers' concern over contaminated products.
 
 
 172
 The general test of recovery for these claimants is whether their business of supplying a vital commodity or service to those engaged in the maritime industry has been interrupted by the collision, the closure, or the embargo. Marinas, for example, in the afflicted area should be allowed to recover. If all shipping and boating is suspended, then a marina or drydock in the area affected is unable to supply docking or repair services to users of the waterway.[34] No mitigation of damages is possible. The same would be true for similarly situated boat charterers who supply marine "common carrier" services.[35] Bait and tackle shops present a similar situation: The condemnation of a large fishing area damages or destroys the livelihood of those shops whose business is exclusively predicated upon supplying direct inputs (bait, fuel) to those whose commercial undertakings have been foreclosed by the quarantine and embargo.[36] Finally, seafood processors and seafood wholesalers that provide services for the condemned area should recover.
 
 
 173
 There is a point beyond which we cannot allow recovery. Seafood restaurants, for example, are not providers of a vital service to the afflicted area. Their damage is not sufficiently distinguishable from general economic dislocation to allow for recovery. They are too removed from the tortious act. A plaintiff may also be barred because it is not sufficiently involved with the afflicted area as a supplier of vital inputs peculiar to maritime activities. The bar would arise, for example, if a bait and tackle shop were only partially connected with a foreclosed area. Basically, a claim for damages that is indistinguishable from a general grievance furnishes no basis for recovery.
 
 3. The Measure of Recovery
 
 174
 Generally, lost profits should be awarded to eligible claimants. Their livelihood has been compromised, and only a recovery of the value of that livelihood, however imprecise the calculation may be, can approach compensation for the losses they have suffered.
 
 
 175
 Commercial fishermen, oystermen, shrimpers, and crabbers should recover the profits that they lost during the closure of the area. The measurement of their loss should be the difference between their actual earnings and the earnings they would have had if the PCP were never spilled (based on historical calculations), if there were no closure of the fishing grounds, and if there were no depression of the demand for seafood because of the embargo and the attendant adverse publicity. This measure of damages would also apply to land-based businesses, such as eligible drydocks, marinas, bait or tackle shops, seafood processors, and seafood wholesalers.
 
 
 176
 Trapped shippers should recover for additional expenses of crew, fuel, demurrage, tug hire, or any other foreseeable direct expenses that these ships would not have incurred but for the accident. Loss of profit arising from maritime casualty may be awarded as long as it is proved with reasonable certainty. Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc., 5th Cir.1984, 747 F.2d 995, 1001. Generally this involves demonstrating that the shipper "has been engaged, or was capable of being engaged in a profitable commerce". Id. We would not, however, require that the shipper prove that specific cargos were not carried because of the accident. We would instead follow the "time-honored rule" that the "proper method of determining lost detention profits is to seek a fair average based on a number of voyages before and after". Id.
 
 
 177
 IV. ADVANTAGES OF THE ALTERNATE RULE OF RECOVERY
 
 
 178
 The advantages of this alternate rule of recovery are that it compensates damaged plaintiffs, imposes the cost of damages upon those who have caused the harm, is consistent with economic principles of modern tort law, and frees courts from the necessity of creating a piecemeal quilt of exceptions to avoid the harsh effects of the Robins rule.
 
 
 179
 A. Extrinsic Notions of Fairness and Case-by-Case Adjudication
 
 
 180
 If tort law fails to compensate plaintiffs or to impose the cost of damages on those who caused the harm, it should be under a warrant clear of necessity. When a rule of law, once extended, leads to inequitable results and creates principles of recovery that are at odds with the great weight of tort jurisprudence, then that rule of law merits scrutiny. A strict application of the extension denies recovery to many plaintiffs who should be awarded damages.[37] Conventional tort principles of foreseeability, proximate causation, and "particular" damages would avoid such unfairness.
 
 
 181
 It is true that application of foreseeability and proximate causation would necessitate case-by-case adjudication. But I have a more optimistic assessment of courts' ability to undertake such adjudication than the majority.[38] Certainly such an inquiry would be no different from our daily task of weighing such claims in other tort cases.
 
 
 182
 The majority opinion also states that the Robins rule, being free from the vagaries of factual findings in a case-by-case determination, serves an important normative function because it is more predictable and more "candid". Normative values would also be served, however, by eliminating a broad categorical rule that is insensitive to equitable and social policy concerns that would support allowing the plaintiffs' claims in many individual cases. In assessing "normative concerns", the courts' compass should be a sense of fairness and equity, both of which are better served by allowing plaintiffs to present their claims under usual tort standards. It is not clear, moreover, that a jury's finding of negligence in a case-by-case determination is "less the product of a determinable rule of law" when the finder of fact is guided in its determination by rules of law. The jury's finding of liability in this case would be no more "lawless" than a finding of proximate cause, foreseeability, and particular damages in a physical damage case.
 
 B. The Economic Arguments
 
 183
 The economic arguments regarding allocation of loss that purportedly favor the Robins rule of nonliability are not as clear to me as they appear to be to the majority. It is true that denial of recovery may effectively spread the loss over the victims. It is not certain, however, that victims are generally better insurors against the risk of loss caused by tortious acts having widespread consequences. Although the victims do possess greater knowledge of their circumstances and their potential damages, we do not know whether insurance against these types of losses is readily available to the businesses that may be affected. We do know that insurance against this kind of loss is already available for shippers. Imposition of liability upon the shippers helps ensure that the potential tortfeasor faces incentives to take the proper care. The majority's point is well taken that the incentives to avoid accidents do not increase once potential losses pass a certain measure of enormity. But in truth we have no idea what this measure is: Absent hard data, I would rather err on the side of receiving little additional benefit from imposing additional quanta of liability than err by adhering to Robins' inequitable rule and bar victims' recovery on the mistaken belief that a "marginal incentive curve" was flat, or nearly so. If a loss must be borne, it is no worse if a "merely" negligent defendant bears the loss than an innocent plaintiff absorb the damages.
 
 V. CONCLUSION
 
 184
 The Robins approach restricts liability more severely than the policies behind limitations on liability require and imposes the cost of the accident on the victim, who is usually not in a superior position to obtain insurance to cover this loss. I would apply a rule of recovery based on conventional tort principles of proximate cause and foreseeability and limit eligibility only by the requirement that a claimant prove "particular" damages.
 
 
 185
 ALVIN B. RUBIN, Circuit Judge, with whom WISDOM, POLITZ and TATE, Circuit Judges, join, dissenting.
 
 
 186
 While voting to deny damages to all of the plaintiffs who joined in this appeal on the basis of the Robins rule, several of our colleagues who joined to make up the majority have indicated some concern about applying the rule so as to deny damages to every claimant who has not suffered a physical injury to a proprietary interest. Thus, the majority opinion refrains from agreeing or disagreeing with the Ninth Circuit decision in Union Oil, permitting recovery, in the absence of physical injury to a proprietary interest, by "commercial fishermen, plaintiffs whose economic losses were characterized as 'of a particular and special nature,' " and would leave that question "for later." It may be assumed, therefore, that some who joined in the opinion may not be disposed to deny damages to fishermen. Judge Williams would go further and expressly recognize the right of commercial fishermen as "foreseeable plaintiffs whose interests the oil company had a duty to protect when conducting its operations which resulted in the spillage." Judge Garwood does not think that Robins requires proof of physical injury in every case. These views evidence that in fact a majority of the court is unwilling to impose an unqualified requirement of physical injury to a proprietary interest.
 
 
 187
 Judge Gee's view, in which Chief Judge Clark joins, is that, while we should not go beyond the physical-injury requirement, the question of scope of liability for damages should be resolved by legislative action. If, however, the limited-recovery rule is fair, it does not require Congressional consideration.
 
 
 188
 I agree with Judge Gee and Chief Judge Clark that the subject calls for legislative consideration and that the necessary application of principle accompanied by suitable line drawing can be better accomplished by statute. However, I would not await such action, for, in default of it, every time we reject a claim we act as decisively and finally as if we had allowed it--as definitively as if we were adhering to a statutory command not to allow damages when no such command has been given. The constitutional grant of jurisdiction to federal courts over cases and controversies not only empowers but requires us to review the constitutionality of legislation, as the Court held in Marbury v. Madison[1] a century and a half ago. It equally empowers and requires us to decide other cases within our jurisdiction whether or not Congress has provided a rule of decision and even when we think Congress should have acted and has not done so.
 
 
 189
 Robins should not be extended beyond its actual holding and should not be applied in cases like this, for the result is a denial of recompense to innocent persons who have suffered a real injury as a result of someone else's fault. We should not flinch from redressing injury because Congress has been indifferent to the problem.
 
 
 
 [1]
 We do not address intentional tort or ultrahazardous activity, such as blasting
 
 
 [2]
 Stated more generally, the summary judgment denied the claims asserted by shipping interests suffering losses from delays or rerouting, marina and boat operators, wholesale and retail seafood enterprises not actually engaged in fishing, shrimping, crabbing or oystering in the area, seafood restaurants, tackle and bait shops, and recreational fishermen, oystermen, shrimpers and crabbers. The rights of commercial fishermen who survived summary judgment are not before us
 
 
 [3]
 The arguments of plaintiffs are not uniform, but their differences are largely in emphasis and focus
 
 
 [4]
 Professor Carpenter's article, supra at p. 5, came within months of Robins Dry Dock, and sounded the drumbeat for change with arguments similar to those now urged. What is relevant here is that the courts did not follow Professor Carpenter's call to abandon the physical injury requirement. As Professor James pointed out:
 The failure of the movement to gain momentum takes on added significance when it is put into context. It coincided with a veritable ground swell in the law of negligence that pushed liability for physical injuries toward the full extent of what was foreseeable and shattered ancient barriers to recovery based on limitations associated with privity of contract and similar restrictive concepts.
 James, supra, at 47 (citing 2 Harper & James Secs. 18.3, 18.5, chs. 27-29 (1956 & Supp.1968); Prosser, The Fall of the Citadel, 50 Minn.L.Rev. 791 (1966); Wade, Strict Tort Liability of Manufacturers, 19 Sw.L.J. 5 (1965)).
 
 
 [5]
 The Eleventh Circuit has applied the Robins Dry Dock rule as developed in our own circuit. See Kingston Shipping Co. v. Roberts, 667 F.2d 34 (11th Cir.1982) (owners of vessels delayed when ship channel was blocked due to maritime collision could not recover economic losses). That court recently considered abandoning the Robins Dry Dock doctrine but did not do so. See Hercules Carriers, Inc. v. Florida, 720 F.2d 1201 (11th Cir.1983), aff'd by an equally divided court, 728 F.2d 1359 (11th Cir.1984) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 128, 83 L.Ed.2d 69
 
 
 [6]
 We note that both the Ninth and Eleventh Circuits have permitted crewmembers of a fishing boat to recover for their share of the lost catch when the vessel was negligently damaged. See Carbone v. Ursich, 209 F.2d 178, 181-82 (9th Cir.1953); Miller Industries v. Caterpillar Tractor Co., 733 F.2d 813, 818-20 (11th Cir.1984). Both courts recognized, however, that such recovery was an exception to the general rule
 
 
 [7]
 Kinsman II, 388 F.2d at 822. Judge Kaufman briefly summarized the facts of Kinsman as follows:
 [A]s result of the negligence of the Kinsman Transit Company and the Continental Grain Company the S.S. MacGilvray Shiras broke loose from her moorings and careened stern first down the narrow, S-shaped river channel. She struck the S.S. Michael K. Tewksbury, which in turn broke loose from her moorings and drifted down-stream--followed by the Shiras--until she crashed into the Michigan Avenue Bridge. The bridge collapsed and its wreckage, together with the Tewksbury and the Shiras, formed a dam which caused extensive flooding and an ice jam reaching almost 3 miles upstream. As a result of this disaster, transportation on the river was disrupted [for] a period of about 2 months.
 Id.
 
 
 [8]
 Judge Kaufman wrote:
 We ... prefer to leave the rock-strewn path of "negligent interference with contract" for more familiar tort terrain. Cargill and Cargo Carriers argue broadly that they suffered damage as a result of defendants' negligence and we will deal with their claims in these terms instead of on the more esoteric "negligent interference" ground.
 Having determined our course, we nevertheless conclude that recovery was properly denied on the facts of this case because the injuries to Cargill and Cargo Carriers were too "remote" or "indirect" a consequence of defendants' negligence.
 388 F.2d at 824.
 
 
 [9]
 See Marine Navigation Sulphur Carriers, Inc. v. Lone Star Industries, Inc., 638 F.2d 700 (4th Cir.1981), (following Kinsman II and disallowing claims for purely economic injuries suffered when the defendant's vessel collided with a bridge.)
 
 
 [10]
 Judge Sneed wrote:
 Nothing said in this opinion is intended to suggest, for example, that every decline in the general commercial activity of every business in the Santa Barbara area following the occurrences of 1969 constitutes a legally cognizable injury for which the defendants may be responsible. The plaintiffs in the present action lawfully and directly make use of a resource of the sea, viz, its fish, in the ordinary course of their business. This type of use is entitled to protection from negligent conduct by the defendants in their drilling operations. Both the plaintiffs and defendants conduct their business operations away from land and in, on and under the sea. Both must carry on their commercial enterprises in a reasonably prudent manner. Neither should be permitted negligently to inflict commercial injury on the other. We decide no more than this.
 501 F.2d at 570-71.
 A substantial argument can be made that commercial fishermen possess a proprietary interest in fish in waters they normally harvest sufficient to allow recovery for their loss. Whether the claims of commercial fishermen ought to be analyzed in this manner or simply carved from the rule today announced, in the fashion of Union Oil, or allowed at all, we leave for later. That is, today's decision does not foreclose free consideration by a court panel of the claims of commercial fishermen.
 
 
 [11]
 As Professor Henderson put it:
 When asked, cajoled, and finally forced to try to solve unadjudicable problems, courts will inevitably respond in the only manner possible--they will begin exercising managerial authority and the discretion that goes with it. Attempts will be made to disguise the substitution, to preserve appearances, but the process which evolves should (and no doubt eventually will) be recognized for what it is--not adjudication, but an elaborate, expansive masquerade.
 Henderson, Expanding the Negligence Concept: Retreat From the Rule of Law, 51 Ind.L.J. 467, 476-77 (1976).
 
 
 [12]
 Fuller, The Forms and Limits of Adjudication, 92 Harv.L.Rev. 353, 396 (1978). This case illustrates how our technocratic tradition masks a deep difference in attitudes toward the roles of a judiciary. The difference between the majority and dissenting opinions is far more than a choice between competing maritime rules. The majority is driven by the principle of self ordering and modesty for the judicial role; the dissent accepts a role of management which can strain the limits of adjudication
 
 
 [13]
 Plaintiffs argue that the Supreme Court, in Pennsylvania v. Wheeling & Belmont Bridge Co., 54 U.S. (13 How.) 518, 14 L.Ed. 249 (1852), recognized a federal cause of action for public nuisance caused by the obstruction of navigable waterways. As a threshold matter, we note that the Court has apparently foreclosed this line of reasoning in California v. Sierra Club, 451 U.S. 287, 296 n. 7, 101 S.Ct. 1775, 1780 n. 7, 68 L.Ed.2d 101 (1981):
 Respondents suggest that the Wheeling Court held that federal courts were regularly available to entertain actions for nuisance brought by private parties with respect to obstructions on navigable rivers. But nothing in the opinion supports that view. The discussion in that case of the common law of nuisance is based on the Court's position that it was entitled to consider state as well as federal issues in the cause before it. Indeed, that the opinion did not establish a general federal law of nuisance with respect to navigable waterways was a point reiterated in Willamette [Iron Bridge Co. v. Hatch, 125 U.S. 1, 15-17, 8 S.Ct. 811, 818-819, 31 L.Ed. 629 (1888) ]. In short, although there may have been a common-law nuisance cause of action for obstructions of navigable waterways. Wheeling Bridge did not federalize that law. Respondents have cited no decision by this Court that did.
 In any case, our treatment of the nuisance issue, infra, means that plaintiffs here cannot recover whether or not they have a substantive claim for nuisance under federal law.
 
 
 [14]
 Section 10 of the Rivers and Harbors Appropriation Act of 1899 provides in part:
 The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited, and it shall not be lawful to ... excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.
 33 U.S.C. Sec. 403.
 Section 13 of the Act provides in part:
 It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed....
 33 U.S.C. Sec. 407.
 
 
 [15]
 While the Court in California v. Sierra Club addressed only the question whether a private cause of action should be implied under Section 10, we think the Court's decision requires a conclusion that private actions may not be brought under Section 13 either. Both sections were enacted to insure the Federal Government's ability to prevent the obstruction of navigable waterways. We find the Court's analysis of Section 10 under Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) equally applicable to Section 13
 
 
 [16]
 The Admiralty Extension Act provides in part:
 The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.
 46 U.S.C. Sec. 740.
 
 
 [1]
 See Jackson v. Johns-Manville Sales Corporation, 750 F.2d 1314 at 1329 (5th Cir.1985) (en banc) (Clark, Ch.J., dissenting)
 
 
 [2]
 For an overview of allied questions, see Sowell, Knowledge and Decisions, 229 et seq. (1980)
 
 
 *
 Except for the vessel operators (and the recreational fishermen, who suffered no economic loss), the injury suffered by all appellants consists of interference, not with their own actions, but rather entirely with their prospective economic relations with others, either as suppliers or customers. As to the vessel operators, in my view their situation is aptly described in Kinsman II:
 "To anyone familiar with N.Y. traffic there can be no doubt that a foreseeable result of an accident in the Brooklyn Battery Tunnel during rush hour is that thousands of people will be delayed. A driver who negligently caused such an accident would certainly be held accountable to those physically injured in the crash. But we doubt that damages would be recoverable against the negligent driver in favor of truckers or contract carriers who suffered provable losses because of the delay or to the wage earner who was forced to 'clock in' an hour late. And yet it was surely foreseeable that among the many who would be delayed would be truckers and wage earners." 388 F.2d 821 at 825 n. 8.
 
 
 [1]
 Pentachlorophenol (PCP) is toxic to both human and marine life in even moderate quantities. PCP contains dioxin, which has been tentatively linked to cancer in humans and other mammals. This PCP is not phencyclidine [ (phenylcyolohexyl) piperidine], or "angel dust", which is also designated by the initials PCP
 
 
 [2]
 The Coast Guard feared that vessel traffic would stir up any PCP that had settled on the bottom of the Channel
 
 
 [3]
 In Kaiser Aluminum, 5 Cir.1972, 455 F.2d 957, the Court denied a plaintiff's claim for damages after it had to close a portion of its facility when a barge negligently severed a gas supply pipeline owned by a third party. The Court denied recovery:
 "We agree that recovery by Kaiser is precluded as a matter of law because there is (1) no contention that the interference with Kaiser's contract rights was intentional; (2) no evidence that Marshland had knowledge of the existence of the contract between Kaiser and Sugar Bowl Gas, and (3) no showing of facts, by affidavit or otherwise, in opposition to the motion for summary judgment, sufficient to create a genuine issue for trial, of anything more than merely the negligent interference with contract rights.
 Id. at 958.
 
 
 [4]
 The Eleventh Circuit has followed this Court. In Kingston Shipping Co. v. Roberts, 11 Cir.1982, 667 F.2d 34 (per curiam), cert. denied, 1982, 458 U.S. 1108, 102 S.Ct. 3487, 73 L.Ed.2d 1369, that Court stated flatly: "Robins made clear that a party may not recover for economic losses not associated with physical damages." Id. at 35. The court denied any recovery for losses that shippers incurred after a vessel's wreckage blocked the port of Tampa
 In Hercules Carriers v. Florida, 11 Cir.1983, 720 F.2d 1201 (per curiam), the Court, following Kingston, barred recovery by the vessels trapped in Tampa Bay. Judge Thomas Clark concurred specially, calling for en banc reconsideration of Kingston. Judge Clark stated that Robins is essentially a contract, not a tort case. According to Judge Clark, Robins merely held that when A is prevented by C 's negligence from fulfilling his contract with B, B can sue A for breach of contract, but not C for negligence. Where there is no A for B to sue in contract, Judge Clark argued that Robins should not bar suit against C. He urged the court to reject the physical/economic distinction for injuries in favor of the usual "foreseeability" and "remoteness" rules of tort law. The Eleventh Circuit reheard Hercules en banc, but affirmed by an evenly divided court (6-6). 11 Cir.1984, 728 F.2d 1359 (en banc). Because no opinions accompany the affirmance, we do not know if the six affirming judges voted to affirm because they found that the result was mandated by Robins, because they believed the physical damage rule was a good rule, or because they found the plaintiff's damages too remote under even traditional tort doctrine.
 
 
 [5]
 For a discussion of Stevenson and the denial of recovery because of a judicial desire to prevent potentially unlimited liability for negligence, see Comment, Foreseeability of Third-Party Economic Injuries--A Problem in Analysis, 20 U.Chi.L.Rev. 283, 286-87 (1953)
 Courts also worry about the possibility of double counting damages if parties removed from the physically damaged plaintiff were allowed to recover. Justice Holmes summarized the law of damages as follows: "The general tendency of the law, in regards to damages at least, is not to go beyond the first step." Southern Pacific Co. v. Darnell-Lumber Co., 1918, 245 U.S. 531, 533, 38 S.Ct. 186, 62 L.Ed. 451. See Illinois Brick Co. v. Illinois, 1977, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, holding that direct purchasers may recover treble damages from an antitrust wrongdoer, but indirect purchasers may not. Robins avoided double counting of damages by allowing only the injured party to recover.
 
 
 [6]
 The problem of limiting claims here is akin to limiting fire spreading from one house to another from a defendant's negligent spark. New York at first denied recovery for any burning structure, a rule consistent with Robins. Ryan v. New York Central R.R., N.Y. 1866, 35 N.Y. 210. New York then allowed recovery for the first structure burned. Webb v. Rome W. & A.R. Co., N.Y. 1872, 49 N.Y. 420. Other jurisdictions have rejected the Ryan rule altogether. See Prosser, Wade & Schwartz, Torts: Cases and Materials 332 (7th ed. 1982)
 
 
 [7]
 Judge Merhige recognized this difficulty in the litigation concerning the contamination of the Chesapeake Bay from the dumping of the toxic chemical Kepone: "[T]he set of potential plaintiffs seems almost infinite". Pruitt v. Allied Chemical Corp., E.D.Va.1982, 523 F.Supp. 975, 979. In ruling on a motion to dismiss the action for failure to state a claim, Judge Merhige allowed the claims of both the fisherman and the marina-operators (as "surrogates" for recreational fishermen), and disallowed the claims of boat salesmen
 
 
 [8]
 Justice Holmes attempted throughout his judicial career to restrict liability as much as possible. See G. Gilmore, The Death of Contract 14-17 (1974). This concern for limiting liability is out of step with contemporary tort doctrine
 
 
 [9]
 A plaintiff might be able to recover under public nuisance for blockage of the channel through which his ship was to sail. See note 31 and accompanying text. Yet under this Court's extensions of Robins, the plaintiff's claim would be dismissed
 
 
 [10]
 Robins Dry Dock & Repair Co. v. Flint, 1927, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290
 
 
 [11]
 Commentators have long criticized the Robins rule, usually for the reason that negligent interference with contract is more appropriately treated under traditional principles of negligence. See Harper, Interference with Contractual Relations, 47 Nw.U.L.Rev. 873, 885-89 (1953); James, Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal, 25 Vand.L.Rev. 43, 56-57 (1972); Note, Negligent Interference with Economic Expectancy: The Case for Recovery, 16 Stan.L.Rev. 664, 689-92 (1964); Note, Negligent Interference with Contract: Knowledge as a Standard for Recovery, 63 Va.L.Rev. 813, 818-23 (1977); Comment, Foreseeability of Third-Party Economic Injuries--A Problem in Analysis, 20 U.Chi.L.Rev. 283, 286 (1953)
 The rule is also heavily criticized because it denies recovery when the "pragmatic objections" have little or no application:
 "In other cases there will be just a single loss, although the plaintiff's identity and possibly the time of his injury are clouded by uncertainty. When that is the case, liability should not be denied on the basis of the pragmatic objection, and when all the elements usually required for an action grounded on negligence are present, it is submitted that liability should be imposed."
 James, supra, at 57-58 (footnotes omitted) (emphasis added).
 
 
 [12]
 Another exception allowed a master to recover damages as a result of the loss of his servant's services through negligent injury. Mineral Industries, Inc. v. George, N.Y.Sup.Ct.1965, 44 Misc.2d 764, 255 N.Y.S.2d 114. Although the notion of master-servant has fallen into disrepute, Nemo Foundations, Inc. v. New River Co., W.Va., 1971, 155 W.Va. 149, 181 S.E.2d 687, courts have expanded the common law rule that a husband may recover damages for the loss of consortium resulting from torts committed against his wife. A wife can now recover damages for loss of consortium when her husband is injured. See W. Prosser, Handbook of the Law of Torts Sec. 125, at 888-90 (4th ed. 1981). Contracts were protected at common law against interference by torts such as fraud and slander. Note, Tortious Interference with Contractual Relations in the Nineteenth Century: The Transformation of Property, Contract, and Tort, 93 Harv.L.Rev. 1510, 1511-12 (1980)
 
 
 [13]
 See Newlin v. New England Tel. & Tel. Co., Mass.1944, 316 Mass. 234, 54 N.E.2d 929, allowing recovery for mushrooms ruined by cold after the temperature control was interrupted by a telephone company's severance of power lines
 
 
 [14]
 The exception was purportedly grounded on old admiralty cases that allowed recovery, cases which Robins had not explicitly overruled. See Carbone v. Ursich, 9 Cir.1953, 209 F.2d 178, 179-80
 
 
 [15]
 In In re Lyra Shipping Co., E.D.La.1973, 360 F.Supp. 1188, the defendant negligently blocked a canal, forcing the two plaintiffs to incur transportation costs not contemplated in their contracts. The court allowed recovery for wasted fuel and other costs, whether these were borne directly by the carrier or indirectly through the contract by the shipper:
 "I believe that both the statutory 'nuisance' doctrine and ordinary maritime tort law provide viable bases for recovery in this case. Under either rationale, it is plausible to argue that plaintiffs ..., who incurred such additional expenses as extra fuel costs, wages, and the like can recover those damages upon proper proof, and I so hold."
 Id. at 1191. The court noted in dictum, however, that a shipper could not recover for the profit he would have earned had the contract been completed. Id. at 1192 n. 4.
 The Lyra court's award of damages is consistent with a narrow reading of Robins. Strictly construed, Robins held only that the charterer would not recover for the prospective income or profits that he would have received had he been able to use the ship. The question therefore naturally arises if a plaintiff could recover for added costs rather than lost profits. In a search for exceptions to Robins, some courts have held that the case applies only to lost profits. See Note, Negligent Interference with Contract: Knowledge as a Standard for Recovery, 63 Va.L.Rev. 813, 820 (1977).
 
 
 [16]
 In In re China Union Lines, Ltd., S.D.Tex.1907, 285 F.Supp. 426. In that case, the M/V Union Reliance negligently collided with the M/V Berean in the Houston ship channel, and the channel was closed for two days. The court in China Union allowed the plaintiff to recover for loss of profits, additional fuel and other supplies consumed, additional crew hire paid, tug hire incurred to turn the vessel, debt time for longshoremen ordered in Houston, and other substantial expenses. The Court found that the vessel's owner owed a duty to all those using or seeking to use the ship channel not to obstruct their passage. The court also held that a collision in the narrow channel would delay all traffic, and that plaintiffs could recover damages that were incurred because they were denied normal access to the channel
 
 
 [17]
 The Court noted that had the subcontractor sued in his own right, the suit would be barred as an action for lost profits under a contract:
 "The present case is not a suit by McWilliams for the lost profits which it might have earned from the use of the dredges had they not been detained by the delay in the backfilling. To such a suit Robins would squarely apply. The case at bar is a suit by the "owner" of the pipeline project seeking reimbursement of expenses incurred under its subcontract when the project was delayed."
 453 F.2d at 1204.
 It is difficult to distinguish McDermott from Kaiser Alum. & Chem. Corp. v. Marshland Dredging Co., 5 Cir.1972, 455 F.2d 957 (per curiam). In Marshland, the Court cited Robins and then denied recovery after the defendant's dredging operation punctured a high-pressure gas line to the plaintiff's plant, causing the plant to shut down.
 
 
 [18]
 In Dominion Tape of Canada Ltd. v. L.R. McDoald & Sons, Ltd., [1971] 3 Ont. 627, the court explicitly discussed the distinction between added costs and lost profits. The defendants in Dominion Tape negligently caused a power failure that forced the plaintiff to cease manufacturing midway through a working day. The plaintiff paid his employees for the lost time, as required by their employment contract. The judge allowed recovery for the "positive outlays" to the idled workers, id. at 630, but refused to permit recovery for the "mere deprivation of an opportunity" to earn profit from the employees' work, id. at 629
 
 
 [19]
 The references in the first paragraph of the discussion are to Rederi A/B Soya v. Evergreen Marine Corp., E.D.Va.1971, 1972 A.M.C. 1555, aff'd, 4 Cir.1972, 1972 A.M.C. 538, and Federal Commerce & Navigation Co. v. M/V Marathonian, 2 Cir.1975, 528 F.2d 907, cert. denied, 1976, 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799
 
 
 [20]
 See Petition of Kinsman Transport, 2 Cir.1968, 388 F.2d 821, leaving "rock-strewn path of 'negligent interference with contract.' " In Kinsman II, the Second Circuit held: "Cargill and Cargo Carriers argue broadly that they suffered damage as a result of defendants' negligence and we will deal with their claims in these terms instead of on the more esoteric 'negligent interference' ground." Id. at 824. Instead, this dissent argues that many of the plaintiffs here are entitled to recover under conventional analyses of negligence, proximate causation, and foreseeability. See id. at 823, explaining, "[W]e hesitate to accept the 'negligent interference with contract' doctrine in the absence of satisfactory reasons for differentiating contractual rights from other interests which the law protects"
 
 
 [21]
 See Note, Negligent Interference with Contract: Knowledge as a Standard for Recovery, 63 Va.L.Rev. 813, 822 (1977) ("Recently several courts have joined in the attack on Robins..... In re Kinsman Transit Co. is the leading case in this movement".)
 
 
 [22]
 Marathonian applied to the rights of time charterers, a factual situation more difficult to distinguish from Robins than was that of Kinsman II. Moreover, this limitation of Robins to time charterers comports with generally accepted notions of fairness--despite the usual harshness of the Robins rule--because time charterers can easily contract with the ship's owner, who would be entitled to recovery, for their protection. In Robins, for example, the shipowner settled its claim against the shipyard; the charterer could have contracted for a share of any such damages. Application of the Robins rule to the original context and to the facts of Marathonian therefore comports with a sense of fundamental fairness
 
 
 [23]
 Judge Sneed also based his holding on the traditional deference accorded to fishermen under maritime law:
 "This long recognized rule [the right of fishermen to recover their share of the prospective catch] is no doubt a manifestation of the familiar principle that seamen are the favorites of admiralty and their economic interests entitled to the fullest possible legal protection. These considerations have given rise to a special right comparable to that of a master to sue for the loss of services of his servant...."
 Id. at 567 (quoting Carbone v. Ursich, 9 Cir.1963, 209 F.2d 179, 182). Judge Ely dissociated himself from the "unnecessary" maritime section of the opinion. Id. at 571.
 I would go further than Oppen in repudiating the applicability of Robins. Oppen allowed the fishermen to recover--a result that all on our Court seem to agree with--but the opinion fails to draw a very convincing line between the rights of fishermen and the rights of others who draw their living from the water. Certainly the injury from the oil spill to others who make their living upon the water, such as boat charterers who are unable to put to sea, is as foreseeable and as direct as the injury to the fishermen. It is therefore unclear why these parties should not also be entitled to recovery. The court did attempt to distinguish fishermen in that they "lawfully and directly make use of a resource of the sea, viz. its fish, in the ordinary course of their business". Id. at 570. Yet, if those who make use of a "resource of the sea" are entitled to recovery, then it seems a fortiori that those who make use of the sea itself in their business--a boat charterer, for example--would be entitled to recovery. Nor can Oppen 's restricted recovery be explained in terms of special property rights in the fish. No one owns a wild animal, or fish, until achieving capture, and under this rule, the fishermen had no rights to the fish superior to those of Union Oil. See Epstein, Nuisance Law: Corrective Justice and Its Utilitarian Constraints, 8 J.Legal Stud. 49 (1979). After reminding us that no one owns a wild animal until after achieving capture, he argues:
 "[S]o it is with unowned fish in Oppen. The plaintiffs who do not own the fish cannot complain if the Union Oil Company captures them. As they cannot complain of capture, they cannot complain of destruction after capture. As they cannot complain of destruction after capture, they cannot complain of it before capture. No theory of tortious liability can make up the plaintiffs' deficit attributable to their want of ownership."
 Id. at 52. See also Posner, Some Uses and Abuses of Economics in Law, 46 U.Chi.L.Rev. 281, 305 (1979).
 The Oppen court's stopping point is no more logical than that of courts that have followed Robins 's extensions. Today, the majority has difficulty in justifying recovery for fishermen while at the same time denying recovery to all other parties. This difficulty highlights Oppen 's failure to have a conceptually tenable stopping point for the imposition of liability and the denial of recovery. If Oppen is consistent with Robins 's extensions, it is only because Oppen attempts to limit liability on as arbitrary a basis as Robins 's progeny.
 
 
 [24]
 The Supreme Court has expanded the rule that physical contact and injury are not necessary for plaintiff to recover damages. America Export Line v. Alvez, 1980, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284. There, the Court allowed a wife who sustained no direct personal physical injury to recover for her losses caused by injuries sustained by her husband when injured as a result of the defendants' negligence. See Alyeska Pipeline Serv. Co. v. Aurora Air Serv. Inc., Alaska 1979, 604 P.2d 1090. In Alyeska, the defendant, Alyeska, contracted with RCA, which in turn contracted with the plaintiff, Aurora Air Service, to provide services necessary for RCA to fulfill its contract with Alyeska. All the contracts were terminable at will. When Alyeska modified its contract with RCA, RCA was forced to terminate its contract with Aurora. Aurora alleged that Alyeska had initiated this chain of events to harm it and claimed contract interference. Id. at 1092-93. The trial court gave judgment for Aurora, and the Alaska Supreme Court affirmed. The court held that a case for tort liability was established by proof that a contract was intentionally disrupted. Id. at 1095. See also Moorhead v. State, La.Ct.App.1977, 353 So.2d 1103, 1105, allowing the plaintiff damages for mental anguish caused by witnessing a trespassing bulldozer remove five trees from her property
 
 
 [25]
 A recent article asserts that applications of Robins only appear to have created the requirement for physical injury. Rizzo, A Theory of Economic Loss in the Law of Torts, 11 J.Legal Stud. 281 (1982). Professor Rizzo has as his central hypothesis that courts' allowance or denial of recovery for economic loss can be explained by the absence or presence of the opportunity to reallocate losses contractually. According to Professor Rizzo, courts have established a rule that, by denying recovery in certain types of situations, will encourage contracts of indemnity between the physically injured party and those suffering pure economic harm. Id. at 291-97. Similarly, courts permit recovery when it would be difficult or impossible for the parties to form such an indemnity contract. This rule, in turn, reduces litigation costs. Id. at 282. In the passage most apposite to the present case, he says:
 "1. Common Property Resources. When property rights are not clearly established as, for example, with respect to fish in streams, rivers, and oceans, channeling costs are virtually infinite. Since no one owns the relevant resource, it is not possible to direct losses through the party suffering injury to his property. Under these circumstances, we would expect the law to permit recovery for economic loss so long as the expected litigation costs are not too high.
 ....
 "Union Oil Co. v. Oppen is the most famous and important of recent common property resource cases."
 Id. at 298-99.
 Professor Rizzo goes on to say that the court allowed only the claims of the fishermen because recovery by "people who suffered inconvenience in not being able to sail out in their boats presumably could not recover"--"The litigation costs would be too high." Id. at 299. We go beyond Oppen, and beyond Professor Rizzo. We would allow recovery based on particular damages, proximate cause, and foreseeability rather than contractual position.
 
 
 [26]
 The majority's opinion in this case suggests that the plaintiffs have drawn an old sword by arguing that Robins should not be extended to cases such as the one at hand. It is true that in the first part of the century there were a number of calls to limit the approach of Robins, but the applicability of those arguments to cases such as the one now before this court is unclear. The clarion call of the earlier movement was an article by Professor Carpenter in the Harvard Law Review on negligent interference with business relations. The proposal in Professor Carpenter's work was for a tort of "interference with business relations for all intentional invasions and at least some negligent ones". Carpenter, Interference with Contract Relations, 41 Harv.L.Rev. 728, 729. The movement may have gone further than the majority acknowledges. See Perlman, Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine, 49 U.Chi.L.Rev. 61, 63-69 (1982). Courts have increasingly allowed recoveries for interference with contract, although this area of the law has developed piecemeal and is badly fragmented. Id
 Putting aside that question, the success of the movement for a tort of interference with contract is largely irrelevant to the merits of the doctrine I advocate here. Many of the claimants here are entitled to recover under the conventional tort doctrines of proximate cause and foreseeability. There is no need for these plaintiffs to rely on any doctrine of negligent interference with contract.
 
 
 [27]
 A public nuisance is a wrong that affects or interferes with an interest or a right common to the general public. The interference, however, must be more than an infringement on the interest of many people. It must interfere with a right common to all members of the public. Restatement (Second) of Torts Sec. 821B comment g (1977) elaborates:
 "g. Interference with public right..... [T]he pollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does not for that reason alone become a public nuisance. If, however, the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public nuisance."
 As Dean Prosser has written:
 "It is not, however, necessary that the entire community be affected, so long as the nuisance will interfere with those who come in contact with it in the exercise of the public right. The obvious illustration, of course, is the obstruction of a public highway which inconveniences only those who are travelling upon it."
 Prosser, Private Action for Public Nuisance, 52 Va.L.Rev. 997, 1001-02 (1966).
 It is well settled that a public nuisance can arise out of conduct that is merely negligent. Id. at 1004. In Piscataqua Navigation Co. v. New York, N.H. & H.R.R., D.Mass.1898, 89 Fed. 362, for example, a railroad was held liable for failure to prevent a bridge from falling into a navigable stream. Moreover, the Supreme Court has held that an obstruction of a navigable channel was a public nuisance that would give rise to a cause of action for damages:
 "[A]lthough this right of navigation be a public right common to all, yet, a private party sustaining special damage by the obstruction may, as has been held in this case, maintain an action at law against the party creating it.... In both cases, the private right to damages, or to the removal, arise out [of] the unlawful interference with the enjoyment of the public right, which, as we have seen, is under the regulation of Congress."
 State v. Wheeling & Belmont Bridge Co., 1855, 59 (18 How.) U.S. 421, 431, 15 L.Ed. 435. There is no reason to believe that the "public right" would be limited to navigation of the stream. It could include drawing fish from the sea as well.
 
 
 [28]
 The usual reason given for this requirement was that the plaintiff did not and could not represent the king, "and the vindication of royal rights was properly left to his duly constituted officers". Prosser, Private Action for Public Nuisance, 52 Va.L.Rev. at 1007. It seems to me, however, that the reasons were primarily practical. Courts wanted to limit access so that their time would not be consumed with complaints about public matters from a multitude of people who alleged they suffered some damage. This is especially true when damages are trivial. See id
 
 
 [29]
 Carver v. San Pedro, L.A. & S.L.R.R., S.D.Cal.1906, 151 Fed. 334; Piscataqua Nav. Co. v. New York, N.H. & H.R.R., D.Mass.1898, 89 Fed. 362; Page v. Mille Lacs Lumber Co., Minn.1893, 53 Minn. 492, 55 N.W. 608; Wakeman v. Wilbur, N.Y.1895, 147 N.Y. 657, 42 N.E. 341; Gates v. Northern Pac. R.R., 1885, 64 Wis. 64, 24 N.W. 494. See also Restatement (Second) of Torts Sec. 821C comment h, illustrations 9-10, discussing log rafters and commercial boat operators as plaintiffs who may recover under public nuisance. See generally Prosser at 1014, for early illustrations of cases allowing recovery
 
 
 [30]
 See, Burgess v. M/V Tamano, D.Me.1973, 370 F.Supp. 247, aff'd, 1 Cir.1977, 559 F.2d 1200
 "[T]he long standing rule of law is that a private individual can recover in tort for invasion of a public right only if he has suffered damage particular to him--that is, damage different in kind, rather than simply in degree, from that sustained by the public generally. Concededly, the line between damages different in kind and those different only in degree from those suffered by the public at large has been difficult to draw. But the Court is persuaded that the commercial fishermen and clam diggers have sufficiently alleged "particular" damage to support their private actions.
 .... The injury of which [the commercial fishermen and clam diggers] complain has resulted from defendants' alleged interference with their direct exercise of the public right to fish and to dig clams. It would be an incongruous result for the Court to say that a man engaged in commercial fishing or clamming, and dependent thereon for his livelihood, who may have had his business destroyed by the tortious act of another, should be denied any right to recover for his pecuniary loss on the ground that his injury is no different in kind from that sustained by the general public."
 Id. at 250 (citations omitted).
 
 
 [31]
 Hampton v. North Carolina Pulp Co., 1943, 223 N.C. 535, 27 S.E.2d 538; Columbia River Fisherman's Protective Union v. City of St. Helens, 1939, 160 Or. 654, 87 P.2d 195; Strandholm v. Barbey, 1933, 145 Or. 427, 26 P.2d 46; Radich v. Fredrickson, 1932, 139 Or. 378, 10 P.2d 352. See also Restatement (Second) of Torts Sec. 821C comment h, illustration 11, discussing recovery by fisherman who uses specific waters where fish are killed. See generally Prosser at 1014
 
 
 [32]
 Mishaps with oil tankers have shown the widespread damage that can result from damage to a single ship, and past instances of chemical dumping demonstrate the lasting effects of that pollution. See Pruitt v. Allied Chemical Co., E.D.Va.1981, 523 F.Supp. 975
 
 
 [33]
 See Prosser Private Action for Public Harm, 52 Va.L.Rev. at 1013-15, stating that pecuniary loss is generally a particular damage in public nuisance actions that sets the plaintiff apart from the general public
 
 
 [34]
 A marina could not recover for losses from the poor business or closure of its restaurant or a gift shop because these businesses do not provide a vital service to a primary maritime industry
 
 
 [35]
 A marina or charterer located adjacent to a cordoned area would not recover; because marine access is still available, though impeded, these businesses can continue to operate
 I would not allow recovery for bait shop that derived only a small fraction of its business from the condemned area. These businesses sustain losses that may be small or even de minimis. The businesses may also be in a good position to recover some of their losses through efforts in their other markets.
 
 
 [36]
 Bait shops that had long-term contracts would be unable to recover under Robins. I would limit Robins to express contracts
 
 
 [37]
 A "fishermen's exception" blunts some of the sharpest aspects of this harshness, but it is theoretically difficult to justify that recovery while denying the claims of others similarly situated
 
 
 [38]
 The majority criticizes foreseeability because it necessitates a case-by-case determination of liability. But this criticism of "foreseeability" as the criterion for judgment applies with equal force to well-established tort law for physical injury. The unquestioned concepts of foreseeability and proximate cause as established in Palsgraf and its progeny are open to the same condemnation that the majority makes of a rule of liability that would abandon Robins:
 "The result would be that no determinable measure of the limit of foreseeability would precede the decision on liability. We are told that where a claim is too remote, or too tenuous, recovery will be denied. Presumably then, as among all plaintiffs suffering foreseeable economic loss, recovery will turn on a judge['s] or jury's decision. .... The point is not that such a process cannot be administered but rather than its judgments would be much less the product of a determinable rule of law."
 Majority opinion at 1028.
 The majority opinion favors a bright line rule, as opposed to a case-by-case determination of liability, because it enables courts to "adjudicate" rather than to "manage". A bright line rule such as the one the majority proposes, however, requires no adjudication whatsoever. Judges need merely to preside over a self-executing system of limited liability where recovery is predicated upon an easily determined physical injury. The application of such a rule, rather than a case-by-case determination, seems more "management" than adjudication.
 
 
 [1]
 1 Cranch 137, 2 L.Ed. 60 (1803)